# ZENITH RADIO CORP. *v.* HAZELTINE RESEARCH, INC.

No. 80.   Argued November 10, 1970—Decided February 24, 1971

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and BLACK, DOUGLAS, BRENNAN, MARSHALL, and BLACKMUN, JJ., joined. HARLAN, J., filed an opinion concurring in the result, in which STEWART, J., joined, *post*, p. 349.

*Thomas C. McConnell* argued the cause for petitioner. With him on the briefs were *Philip J. Curtis* and *Francis J. McConnell*.

*Victor P. Kayser* argued the cause for respondent. With him on the briefs were *John T. Chadwell, C. Lee Cook, Jr., Joseph V. Giffin, Robert F. Ward,* and *Laurence B. Dodds.*

Mr. Justice White delivered the opinion of the Court.

This is the second time this marathon litigation has been before us. It began in 1959 as a suit for patent infringement brought by Hazeltine Research, Inc. (hereafter HRI), against Zenith. In 1963, Zenith filed a counterclaim against HRI alleging violations of the Sherman and Clayton Acts, as amended, 26 Stat. 209, 38 Stat. 731, 737, 15 U. S. C. §§ 1, 2, 15, 26, by reason of HRI's participation in patent pools in Canada, Great Britain, and Australia. These pools, it was claimed, operated to exclude Zenith from those foreign markets by refusing to grant patent licenses to American manufacturers seeking to export American-made radio and television sets. Trial was had without a jury. Zenith submitted telling evidence as to the existence and operation of the conspiracy and HRI's participation in each of the markets. Zenith demonstrated the fact and extent of its business injury by estimating the percentage of the foreign market it would have enjoyed absent the conspiracy during the four years prior to 1963 and showing the portion it actually enjoyed during those years. The difference between the profits it actually made and the profits it would have made in a free market during the four years was the measure of the damages demanded.

A year after evidence was closed, the trial judge entered preliminary findings of fact and conclusions of law favoring Zenith. He concluded that Zenith had been damaged $6,297,371 in the Canadian market, $9,248,926 in the English, and $692,555 in the Australian, a total of $16,238,872 before trebling. HRI then moved to amend its reply to Zenith's counterclaim and to reopen the record for the taking of additional evidence. The motion sought leave to assert the defenses of limitations and release; the claim was that part or all of the dam-

ages awarded to Zenith for the four years 1959–1963 were caused by pre-1959 conduct and to that extent were barred by the statute of limitations, 15 U. S. C. § 15b, or by a release given by Zenith to certain American companies in 1957. HRI also sought leave to prove that until specified dates Zenith's exclusion from the English and Australian markets had been due, not to the operation of the alleged patent pools, but to such matters as official embargoes, tariffs, and technical factors. The trial judge agreed to take additional evidence with respect to England and Australia but refused to reopen the record for other purposes or to modify his findings and conclusions concerning the Canadian market. He did, however, permit the limitations and release defenses to be filed and, after hearing evidence with respect to the English and Australian markets, reduced his award of damages with respect to them. 239 F. Supp. 51 (1965).

In the Court of Appeals, HRI asserted error on various grounds. Putting aside other issues, the Court of Appeals reversed on the ground that Zenith had failed to prove injury to its business in any of the three markets. 388 F. 2d 25 (1967). We, in turn, affirmed the judgment denying recovery for the alleged injury in the English and Australian markets, but reversed with respect to Canada, holding that Zenith's evidence amply demonstrated the fact of damage in the Canadian market. 395 U. S. 100 (1969). We also noted that some portion of the damages proved and awarded resulted from conspiratorial conduct prior to 1959 and that the trial judge had either rejected on the merits the defenses of limitations and release or deemed them waived. *Id.,* at 117 n. 13. We went no further, however, with respect to the issues surrounding either defense.

The Court of Appeals on remand accepted as duly proved that absent the conspiracy Zenith would have

enjoyed a 16% share of the Canadian market and that the difference between 16% and the share it actually had was the measure of the total damages inflicted by the conspiracy during the four years 1959–1963. But recognizing that some portion of Zenith's business injury resulted from conspiratorial conduct prior to 1959, the court went on to hold that the trial judge had not rejected the defenses of limitations and release on waiver grounds but had erroneously rejected them on their merits, and further that Zenith's claim that the statute had been tolled had been waived by Zenith and was in any event unsound. Finally, the court ordered further evidence to be taken in the trial court to determine the extent to which, if any, the damages awarded by the trial court should be reduced by virtue of the defenses sustained in the Court of Appeals. 418 F. 2d 21 (1969).

We granted certiorari. 397 U. S. 979 (1970). Zenith's principal contentions here are that the trial judge properly deemed the limitations and release defenses to have been waived, that if not waived, the defenses were without merit, and that in any event the statute of limitations was tolled by the pendency of a Government suit against HRI's coconspirators. We need not decide whether the trial judge held the defenses waived or rejected them on the merits, since in our view, either course would have been legally sound. We therefore reverse the Court of Appeals.

## I

We deal first with Zenith's claim that the defenses of limitations and release were properly held by the trial court to have been waived. To do so it is essential briefly to outline the course of the trial and evidence. Zenith's 1963 counterclaim alleged the existence of the conspiracy and the impact on its business and prayed for damages and injunctive relief, but made no allegations as to the time period as to which damages were sought.

These latter matters became clear during the pretrial proceedings and during the course of the trial itself. In its pretrial brief and opening statement Zenith asserted that the illegal pools had existed for many years; that Zenith had conspiratorially been refused a license to import into Canada; and that litigation had been threatened and potential distributors discouraged. The conspiracy was said to have been not only a longstanding but also a worldwide one, against certain members of which the United States Government had brought an antitrust action and Zenith itself had recovered $10,000,000 in 1957 in settlement of a civil treble-damage action. But Zenith disclosed that, although the conspiracy had been worldwide and long existing, it would seek to recover damages for restraint of its trade in the three foreign markets only during the "four-year statutory damage period."

At trial Zenith introduced voluminous evidence with respect to the operations of the conspiracy and its impact on its business. The testimony with respect to Canada was that in a free market Zenith would have had the same share of the Canadian market as it enjoyed in the United States and that the existence and operation of the conspiracy had restricted its Canadian business. Specifically, Zenith claimed that in the four years after June 1, 1959, it had lost profits aggregating some $6,300,000 as the result of conspiratorial conduct by the Canadian patent pool during and prior to that period. Counsel made Zenith's position perfectly clear in his summation and post-trial brief: except for the Canadian pool, Zenith would have had a 16% share of the Canadian market, but as a result of the pool it had only a 3% share. Zenith thus argued that it was entitled to the full difference between 16% and 3% for the entire four-year period. It also made similar claims with respect to the English and Australian markets.

Although Zenith's counterclaim on its face sought to recover all damages suffered in past years without restriction,[1] HRI pleaded neither limitations nor release in its reply to the counterclaim. Zenith instead revealed its own awareness of the statutory limitation period during the trial and expressly restricted its proof to damages suffered during the statutory four-year damage period. However, Zenith sought to recover all damages suffered during those years even though it was unmistakably clear that some of this damage had been caused by conspiratorial action prior to 1959. Yet, at no time during the trial did HRI suggest that the statute barred Zenith's recovery of any part of its total damage suffered during that period. HRI did challenge Zenith's claim that it would have had a 16% share of the Canadian market on the ground that the evidence was speculative—indeed, that it was so speculative that Zenith had failed entirely to sustain its burden of proving damage, but it interposed no objection to Zenith's demand for all damages sustained during the four-year period, no matter when the operative acts had occurred. Not until one year after trial, when it learned that the judge's findings and conclusions were unfavorable, did HRI assert that part of the post-1959 damage was the result of pre-1959 conduct and was barred either by the statute of limitations or by the

---

[1] It is true that in its motion for leave to file its counterclaim, Zenith stated that the counterclaim arose out of conduct of HRI "occurring since the filing of the answer" in 1960. On the basis of this statement, HRI argues that Zenith precluded itself from recovering damages resulting from pre-answer conduct. This argument is not persuasive. The counterclaim itself was not so limited, and Zenith made its position on damages absolutely clear by the opening of trial. HRI was thereby given both ample notice of the substance of Zenith's claim and ample opportunity to respond, but made no effort during trial to do so.

release given by Zenith in 1957 in settlement of its suit against other American companies.[2]

Other than a general attack on the sufficiency of Zenith's proof of damages and a demand that the matter be relitigated, HRI's post-trial motion had three principal branches. First, it sought leave to file the defense of limitations. The motion in effect asserted that the conspiracy, even if it had continued during the damage period, had committed no damaging overt acts during that period, all of Zenith's damage being caused by pre-1959 operations of the pool. HRI asserted as a legal matter that the statute of limitations would therefore bar Zenith's entire claim on the record then before the Court. Second, HRI sought to interpose the defense of release. The argument was that some or all of Zenith's post-1959 damages were the consequence of pool activity occurring prior to the date of a 1957 release given to American companies which were coconspirators of HRI in the Canadian pool. That release, it was claimed, also released HRI. Third, HRI sought to reopen the record to show that until well into the four-year damage period Zenith's inability to enter the English and Australian markets was due to official embargoes, other governmental policies and technical difficulties rather than to the operations of the patent pools.

The motion was thoroughly and extensively argued. With respect to the defenses of limitations and release,

---

[2] Zenith similarly limited its claim for damages in the English and Australian markets to the years 1959–1963 and similarly sought to recover all damages suffered in those years without regard to the date of the conduct causing the damages. HRI again did not plead or argue that Zenith was not entitled to its full damages during those years in the two markets, until it moved after trial to set aside the judge's findings and to reopen the proof so that it could show that Zenith's exclusion from the markets prior to 1959 was a consequence of governmental restrictions and technical difficulties rather than of pool conduct.

the trial court's ruling, after Zenith objected to them as being "too late," was expressed as follows: "Well, the record will show that leave is given to file them at this time, after proofs are closed and after findings have been made." [3] This ruling was immediately followed by the court's refusal either to reopen the record for additional evidence with respect to Canada or to modify its judgment in any way as to that market. The record as to England and Australia, however, was reopened for further proof as to the operative forces other than the patent pools which in fact had prevented importation of Zenith's products into those markets.

Arguably, since the trial judge permitted the limitations and release defenses to be filed but then rejected them by refusing to amend the judgment with respect to Canada, rejection was necessarily on the merits. But the record also yields to the construction that the two defenses were overruled because a just and sensible ruling on their merits would have required a reopening of the record for a virtual retrial of the issue of damages, an eventuality which the trial court deemed unwarranted in view of HRI's delinquency in raising the defenses. If this was the course the trial judge took, we would not disturb his judgment.

At the time of the trial Rule 8 (c) of the Federal Rules of Civil Procedure required that "[i]n pleading to a preceding pleading, a party shall set forth affirmatively . . . release . . . statute of limitations . . . and any other matter constituting an avoidance or affirmative defense." Rule 12 (h) at that time provided that "[a] party waives all defenses and objections which he does not present"

---

[3] The District Court gave HRI five days to file its amendments to the pleadings "nunc pro tunc as of" the date of the argument on HRI's motion. As a result, the defenses were technically filed prior to the entry of judgment and the taking of appeal, while the District Court still retained jurisdiction over the suit.

either by motion or in answer or reply. Based on these rules, Zenith claims that the trial court was required to, and did, hold the two defenses waived.

HRI contends that the District Court should have granted it leave to amend its answer under Rule 15 (a), which provides that such "leave shall be freely given when justice so requires." HRI's position is that the evidence in the record at the time it offered its defenses showed that all of the acts causing damage during the 1959–1963 period had occurred prior to 1959; from this it follows that Zenith had failed, according to HRI, to offer any evidence upon which an award of damages could have been sustained. In the alternative, HRI argues that the record showed that it had been released from all liability for damages flowing from pre-1957 acts.[4] In either case, HRI urges that the damage award be set aside.

It is settled that the grant of leave to amend the pleadings pursuant to Rule 15 (a) is within the discretion of the trial court. *Foman* v. *Davis,* 371 U. S. 178, 182 (1962) (dictum). In a matter as substantial and complex as this one, where HRI claimed it had been misled or at the very least asked to be relieved of mistake or oversight, it might have been within the discretion of the trial judge to have permitted HRI to amend its pleadings to include therein the defenses of limitations and release. But, in deciding whether to permit such an amendment,

---

[4] At the time HRI raised its defenses, the release on which it relied was not part of the record, although the record did contain a contract between the parties to the release in which they agreed to exchange releases, and frequent reference had been made during trial to the settlement of which the exchange of releases was a part. The record also belied HRI's claim that the conspiracy had been dormant during 1959–1963, for it contained a letter written in 1962 from the pool to a distributor of Motorola products in Canada threatening infringement suits if he continued to distribute American-made products of Motorola.

the trial court was required to take into account any prejudice that Zenith would have suffered as a result, see *Kanelos* v. *Kettler,* 132 U. S. App. D. C. 133, 136–137, n. 15, 406 F. 2d 951, 954–955, n. 15 (1968); *United States* v. *47 Bottles, More or Less,* 320 F. 2d 564, 573–574 (CA3 1963); *Caddy-Imler Creations* v. *Caddy,* 299 F. 2d 79, 84 (CA9 1962); 3 J. Moore, Federal Practice ¶ 15.08 [4] (2d ed. 1968), and here the prejudice to Zenith would have been substantial. Zenith's theory that all of its damages suffered during the four-year period were legally recoverable had been made quite clear during the trial, and Zenith had proved up its damages in accordance with that theory. Meanwhile HRI had neither pleaded its defenses, objected to Zenith's evidence, nor otherwise hinted that post-1959 damages caused by pre-1959 conduct were for any reason barred until long after the record had been closed. To have then sustained HRI's defenses would have been to deny Zenith the opportunity to prove its recoverable damages—a denial that hardly comports with the letter or the spirit of Rule 15 (a). At the very minimum, if the defense of limitations or release was to be entertained and deemed to bar that part of Zenith's damages resulting from the lingering consequences of past acts, Zenith would have been entitled to perfect its proof as to damage resulting from pool operations during the four-year period, as well as to prove, if it could, what damages it might have suffered in the future from those acts. To have permitted Zenith to perfect its proof would, of course, have required reopening of the record and a virtual retrial of the issue of damages.

The trial judge here might have permitted reopening. Like a motion under Rule 15 (a) to amend the pleadings, a motion to reopen to submit additional proof is addressed to his sound discretion. See, *e. g., Swartz* v. *New York Central R. Co.,* 323 F. 2d 713, 714 (CA7 1963);

*Locklin* v. *Switzer Bros.,* 299 F. 2d 160, 169–170 (CA9 1961); *Gas Ridge, Inc.* v. *Suburban Agricultural Properties, Inc.,* 150 F. 2d 363, 366, rehearing denied, 150 F. 2d 1020 (CA5 1945); 6A J. Moore, Federal Practice ¶ 59.04 [13] (2d ed. 1966). But the record is clear that he refused to reopen with respect to damages in the Canadian market or otherwise to modify the Canadian judgment, and that he thereby rejected HRI's proffered defenses. Although we are not privy to his unexpressed thinking and although his refusal can be read as a rejection of the defenses on the merits, it can also be read as a holding that the defenses were, in effect, waived by the untimeliness of their presentation and hence that the pleadings would not be amended, except as a matter of form, and that the trial would not be reopened.

On the assumption that the trial court did hold the defenses of limitations and release to have been waived, we cannot say that the judge abused his discretion or stressed too much the value of avoiding reopening a trial to litigate matters that HRI had had an opportunity, but neglected, to litigate. Nor is it irrelevant in this connection that HRI's central claims during trial were that there was no conspiracy and that Zenith had suffered no damage at all. The defenses that HRI set out in the post-trial motions were in a sense inconsistent with these trial claims, for the defenses conceded, albeit only *arguendo,* that a conspiracy did exist and that Zenith, absent the conspiracy, would have controlled a sizable share of the Canadian market. HRI's post-trial argument, in effect, was one of confession and avoidance showing that the conspiracy had been so successful in the pre-1959 period that it could be relatively or entirely quiescent from 1959 to 1963 and nonetheless cause Zenith substantial damages in those years. It is quite possible that HRI knew exactly what it was doing in not presenting this argument during trial and that it realized a

need to present it only after it learned that its original arguments had not induced the court to hold in its favor.

Whatever HRI's reasons for not offering its limitations and release defenses during trial, however, the trial court would not have erred in concluding that they were waived.

## II

Assuming, however, that the District Judge rejected the defenses of limitations and release on the merits, as the Court of Appeals held, we confront the issue of whether it is consistent with the controlling limitations statute, 15 U. S. C. § 15b, to permit Zenith to recover all of the damages it suffered during the years 1959–1963 even though some undetermined portion of those damages was the proximate result of conduct occurring more than four years prior to the filing of the counterclaim. HRI contends, and the Court of Appeals held, that the statute permits the recovery only of those damages caused by overt acts committed during the four-year period. We do not agree.

## A

We turn first to Zenith's argument that, even if the statute of limitations were to be held applicable in this case, the statute was nonetheless tolled from November 24, 1958, to November 1, 1963,[5] pursuant to 15 U. S. C. § 16 (b) by reason of a Government antitrust action brought against various American companies

---

[5] On November 1, 1962, a consent decree was entered against the last defendant named in the Government action, which had been commenced on November 24, 1958, thereby terminating that action as to all parties. See *Barnett* v. *Warner Bros. Pictures Dist. Corp.,* 112 F. Supp. 5, 7 (ND Ill. 1953). For purposes of the present suit against HRI, which was not a party to the Government action, the running of the statute of limitations was thus tolled until November 1, 1963—one year after the entry of the consent decree. See 15 U. S. C. § 16 (b).

participating along with HRI in the Canadian pool.[6] If Zenith is correct in this respect and the running of the statute of limitations was suspended during the pendency of the Government suit, then it was entitled at the very least to sue in 1963 for any damage to its business occurring by reason of conspiratorial conduct at any time after November 24, 1954.

The Court of Appeals rejected the tolling argument. It had some doubt whether tolling was properly before it since Zenith had never entered a formal plea of tolling, and HRI now contends that Zenith's failure to so plead in its original complaint bars it forever from raising such a claim. This contention is without merit. The cases on which HRI relies themselves establish that where, as here, a plaintiff has no reason to anticipate that a claim of limitations will be raised against him, he need not set forth his claim of tolling until the limitations claim is raised. See *National & Transcontinental Trading Corp. v. International General Elec. Co.*, 15 F. R. D. 379, 382 (SDNY 1954). Cf. *Moviecolor Ltd. v. Eastman Kodak Co.*, 288 F. 2d 80, 88 (CA2 1961). Nor should Zenith be penalized for failing to enter a formal plea of tolling in response to HRI's belated limitations plea, for Zenith can hardly be blamed for reading the remarks of the trial judge as a rejection of the limitations defense on the ground of waiver. Zenith was never unambiguously called upon to submit a formal plea; to hold under such circumstances that want of a submission amounts to a waiver would be to treat pleading as "a game of skill in

---

[6] The Government suit was *United States v. General Electric Co.*, Civil Action No. 140–157, which was brought in the Southern District of New York. The complaint and the final judgment were introduced in evidence in the present proceedings as Plaintiff's Exhibits Nos. 44–47.

which one misstep by counsel may be decisive to the outcome"—an approach we have consistently rejected. See *Foman* v. *Davis, supra,* at 181–182; *United States* v. *Hougham,* 364 U. S. 310, 317 (1960); *Conley* v. *Gibson,* 355 U. S. 41, 48 (1957). The interests of justice thus clearly require that if HRI's limitations defense is to be considered on its merits, Zenith's claim of tolling must be dealt with as well.

The Court of Appeals did, in fact, consider the tolling issue on the merits, but concluded that tolling takes place only with respect to parties to a Government suit and hence that tolling did not occur here because HRI was not such a party. This was error. The language of 15 U. S. C. § 16 (b) expressly provides for tolling of the statute of limitations "in respect of *every* private right of action . . . based *in whole or in part* on any matter complained of" in the proceeding instituted by the Government. (Emphasis added.) On the face of this section, a private party who brings suit for a conspiracy against which the Government has already brought suit is undeniably basing its claim in whole or in part upon the matter complained of in the Government suit, even if the defendant named in the private suit was named neither as a defendant nor as a coconspirator by the Government. If, that is, the Government sues only certain conspirators, but also alleges and proves during trial that others were conspirators, the fact of the tolling of the statute against those so proved but not sued can hardly be denied. Nor could tolling be denied if a defendant had never been shown to be a conspirator by the evidence offered in the earlier Government suit, but then had been proved to be such in the subsequent private suit.

We find no indication in the legislative history of § 16 (b) that Congress intended it to toll the statute of limitations only against parties defendant in the Govern-

ment action. Nor is anything cited to us in this respect.[7] On the contrary, as we have said earlier, Congress, believing that "private antitrust litigation is one of the surest weapons for effective enforcement of the antitrust laws," enacted § 16 (b) in order to "assist private litigants in utilizing any benefits they might cull from government antitrust actions." *Minnesota Mining & Mfg. Co.* v. *New Jersey Wood Finishing Co.,* 381 U. S. 311, 317–318 (1965). We see nothing destructive of Congress' purpose in holding that § 16 (b) tolls the statute of limitations against all participants in a conspiracy which is the object of a Government suit, whether or not they are named as defendants or conspirators therein; indeed, to so hold materially furthers congressional policy by permitting private litigants to await the outcome of Government suits and use the benefits accruing therefrom.

It is true that the lower federal courts have until recently confined the operation of the section and held it applicable only to defendants named in the Government suit. See, *e. g., Sun Theatre Corp.* v. *RKO Radio Pictures, Inc.,* 213 F. 2d 284, 290–292 (CA7 1954); *Momand* v. *Universal Film Exchanges, Inc.,* 172 F. 2d 37,

---

[7] HRI does suggest that the 1955 amendment of § 16, see 69 Stat. 283, must be understood as an indication of Congress' approval of earlier cases in the lower federal courts confining the operation of § 16 (b) to parties defendant in Government suits. See text *infra,* this page and 337. We are unpersuaded. HRI can point to no direct evidence that Congress ever considered the issue now before us or voiced any views upon it; on the contrary, it appears that Congress left the matter for authoritative resolution in the courts. The true thrust of HRI's argument is that we must find congressional approval of the earlier cases in Congress' silence when it re-enacted the statute. We did not take such an approach, however, in *Minnesota Mining & Mfg. Co.* v. *New Jersey Wood Finishing Co.,* 381 U. S. 311 (1965), and *Leh* v. *General Petroleum Corp.,* 382 U. S. 54 (1965), and we do not do so here.

48 (CA1 1948). But these cases and others like them, as we have indicated, fly in the face of the language of the statute, are antithetical to its aims, and cannot be squared with our recent decisions in *Minnesota Mining & Mfg. Co.* v. *New Jersey Wood Finishing Co., supra,* and *Leh* v. *General Petroleum Corp.,* 382 U. S. 54 (1965). *Minnesota Mining* held that § 16 (b)'s tolling provision was not confined to those situations in which a Government decree, by virtue of § 16 (a), would be prima facie evidence against defendants in a private suit who had also been named as defendants in a Government suit. It rejected the view that §§ 16 (a) and 16 (b) are wholly interdependent and coextensive; on the contrary, § 16 (b) was given its full sweep. *Leh,* following *Minnesota Mining,* held that a private litigant was entitled to the benefit of tolling although the conspiracy he alleged covered a different time, named additional parties, and excluded some parties named in the prior Government suit. While *Leh* did not explicitly decide whether the statute would be tolled when the sole defendant in a private action covering the same ground as an earlier Government suit had been named neither as a conspirator nor as a party in the Government suit, we do not believe that such a case could be distinguished from *Leh.* Cases in the lower federal courts since *Leh* have also come to this conclusion. See *New Jersey* v. *Morton Salt Co.,* 387 F. 2d 94 (CA3 1967); *Vermont* v. *Cayuga Rock Salt Co.,* 276 F. Supp. 970 (Me. 1967); *Michigan* v. *Morton Salt Co.,* 259 F. Supp. 35, 53–56 (Minn. 1966), aff'd *sub nom. Hardy Salt Co.* v. *Illinois,* 377 F. 2d 768 (CA8 1967).

We therefore hold that Zenith, although suing HRI, which was named neither as a party nor as a coconspirator in the Government suit, is not barred from obtaining the benefits of the tolling statute, since it is undisputed that the conspiracy in which HRI participated was at

least in part the same conspiracy as was the object of the Government's suit. From this it follows that the only issue still remaining upon HRI's limitations claim is whether Zenith can recover in its 1963 suit for damages suffered after June 1, 1959, as the consequence of pre-1954 conspiratorial conduct.

## B

The basic rule is that damages are recoverable under the federal antitrust acts only if suit therefor is "commenced within four years after the cause of action accrued," 15 U. S. C. § 15b, plus any additional number of years during which the statute of limitations was tolled. Generally, a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business. See, *e. g.*, *Suckow Borax Mines Consolidated, Inc.* v. *Borax Consolidated, Ltd.*, 185 F. 2d 196, 208 (CA9 1950); *Bluefields S. S. Co.* v. *United Fruit Co.*, 243 F. 1, 20 (CA3 1917), appeal dismissed, 248 U. S. 595 (1919); *2361 State Corp.* v. *Sealy, Inc.*, 263 F. Supp. 845, 850 (ND Ill. 1967). This much is plain from the treble-damage statute itself. 15 U. S. C. § 15. In the context of a continuing conspiracy to violate the antitrust laws, such as the conspiracy in the instant case, this has usually been understood to mean that each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act. See, *e. g.*, *Crummer Co.* v. *Du Pont*, 223 F. 2d 238, 247–248 (CA5 1955); *Delta Theaters, Inc.* v. *Paramount Pictures, Inc.*, 158 F. Supp. 644, 648 (ED La. 1958); *Momand* v. *Universal Film Exchange, Inc.*, 43 F. Supp. 996, 1006 (Mass. 1942), aff'd, 172 F. 2d, at 49. However, each separate cause of action that so accrues entitles a plaintiff to

recover not only those damages which he has suffered at the date of accrual, but also those which he will suffer in the future from the particular invasion, including what he has suffered during and will predictably suffer after trial. See, *e. g., Farbenfabriken Bayer, A. G.* v. *Sterling Drug, Inc.,* 153 F. Supp. 589, 593 (NJ 1957); *Momand* v. *Universal Film Exchange, Inc., supra,* at 1006. Cf. *Lawlor* v. *Loewe,* 235 U. S. 522, 536 (1915). Thus, if a plaintiff feels the adverse impact of an antitrust conspiracy on a particular date, a cause of action immediately accrues to him to recover all damages incurred by that date and all provable damages that will flow in the future from the acts of the conspirators on that date. To recover those damages, he must sue within the requisite number of years from the accrual of the action. On the other hand, it is hornbook law, in antitrust actions as in others, that even if injury and a cause of action have accrued as of a certain date, future damages that might arise from the conduct sued on are unrecoverable if the fact of their accrual is speculative or their amount and nature unprovable. *Moe Light, Inc.* v. *Foreman,* 238 F. 2d 817, 818 (CA6 1956); *Chicago & N. W. R. Co.* v. *De Clow,* 124 F. 142, 143 (CA8 1903); *Culley* v. *Pennsylvania R. Co.,* 244 F. Supp. 710, 715 (Del. 1965). Cf. *Howard* v. *Stillwell & Bierce Mfg. Co.,* 139 U. S. 199, 206 (1891).

In antitrust and treble-damage actions, refusal to award future profits as too speculative is equivalent to holding that no cause of action has yet accrued for any but those damages already suffered. In these instances, the cause of action for future damages, if they ever occur, will accrue only on the date they are suffered; thereafter the plaintiff may sue to recover them at any time within four years from the date they were inflicted. Cf. *Schenley Industries* v. *N. J. Wine & Spirit Wholesalers Assn.,* 272 F. Supp. 872, 887–888 (NJ 1967);

*Delta Theaters, Inc.* v. *Paramount Pictures, Inc., supra,* at 648–649. Otherwise future damages that could not be proved within four years of the conduct from which they flowed would be forever incapable of recovery, contrary to the congressional purpose that private actions serve "as a bulwark of antitrust enforcement," *Perma Life Mufflers, Inc.* v. *International Parts Corp.,* 392 U. S. 134, 139 (1968), and that the antitrust laws fully "protect the victims of the forbidden practices as well as the public," *Radovich* v. *National Football League,* 352 U. S. 445, 454 (1957). See also *Lawlor* v. *National Screen Serv. Corp.,* 349 U. S. 322, 329 (1955).

As we have already seen, acceptance of Zenith's tolling argument requires further consideration only of that portion of Zenith's damages suffered during the 1959–1963 period as a result of pre-1954 conduct of the conspiracy. We must now determine whether Zenith could have recovered those damages if it had brought suit for them in 1954, for if it could not, it would follow for the reasons stated above that it must be permitted to recover them now.

We do not, of course, have the thinking of the district judge on this issue, and ordinarily the matter of future damages would very much depend on his informed discretion.[8] But we are reluctant to return any issue in this litigation for another round of proceedings in the trial or appellate courts if we can fairly dispose of it

---

[8] If the trial judge had passed upon the question, he well might have concluded that none of the damages sustained by Zenith in the Canadian market between 1959 and 1963 was a consequence of pre-1954 conspiratorial conduct. The trial judge in effect found that, as to England and Australia, the effects of conspiratorial conduct were no longer felt by Zenith more than four years after the conduct had occurred, and there is no reason to infer that his findings would have been different in regard to Canada either in the present suit or in a suit brought in 1954. But the trial judge made no such findings as to Canada, and we lack power to make them for him.

at this juncture. After due consideration, we have determined that in the circumstances of this case, § 15b was no bar to any part of the damages awarded Zenith by the District Court insofar as the Canadian market was concerned.

Let us assume that Zenith in a treble-damage suit brought in 1954 had presented evidence similar to that which it presented in the instant suit, indicating that it would have had the same share of a free Canadian market as it did in the United States market. Assume also that it had presented evidence to the effect that, starting in 1954, when it had no sales in the Canadian market, it would have taken 10 years to reach that share in a free market. Given such evidence, the question would be whether a district court would have permitted Zenith to recover estimated profits upon 90% of its share of the hypothetical free Canadian market for its anticipated losses in 1955, 80% for its losses in 1956, and 70% for its 1957 losses, and so on.[9]

We find it difficult to believe that Zenith could have convinced a District Court sitting in 1954 that, although it contemplated a free market from that time forward, it would still be suffering from provable injury more than five years later. It is true that the damages awarded Zenith in this case were based on estimates of its volume of business in a free market. But those estimates were for a past period of time; the size and conditions in the market were known and the competitive

---

[9] Of course, these percentages are purely hypothetical. They rest upon an assumption that, if Zenith had sued in 1954 for future damages in the Canadian market and had claimed that it would take 10 years for it to attain its full share of that market under free competitive conditions, then it would have proved that in 1955 it would have reached 10% of that share, in 1956, 20%, and so on. In each year it would have recovered damages for that percentage of the share which it had not yet attained.

forces were identifiable. Zenith's performance during the same period and under comparable conditions was a matter of record. It is quite another matter to predict market conditions and the performance of one competitor in that market five to 10 years hence. The proceedings before us put in stark relief the difficulties of proving the fact and the amount of damage during a period in the immediate past. Claims of future damage would have probably gotten short shrift in the lower courts if they had been pressed in this case. In our view, this is the very treatment such claims would have received had Zenith sued in 1954, and claimed damages for the decade of the sixties. The short of it is that Zenith asserted its cause of action for 1959–1963 damages well within the period during which § 15b entitled it to sue.

### III

Entirely apart from its statute of limitations defense, HRI claims that whatever part of the 1959–1963 damages was caused by conspiratorial conduct prior to 1957 is unrecoverable because of a release executed in that year by Zenith in settlement of an antitrust action against other coconspirators in the Canadian patent pool.[10] The

---

[10] The text of the release was as follows:

"To All To Whom These Presents Shall Come Or May Concern, Greeting: Know ye, That Zenith Radio Corporation and The Rauland Corporation, each a corporation organized and existing under and by virtue of the laws of the State of Illinois, for and in consideration of the sum of One Dollar ($1.00) lawful money of the United States of America and other good and valuable consideration, to them in hand paid by *................, the receipt whereof is hereby acknowledged, have each remised, released and forever discharged, and by these presents does each for itself and its respective subsidiaries, successors and assigns remise, release and forever discharge the said *............... and its subsidiaries and their respective successors and assigns of and from all, and all manner of action and actions, cause and causes of action, suits, debts, dues, sums of money, accounts, reckoning, bonds, bills, specialities, covenants, contracts,

release extended not only to past but also to all future damages arising out of pre-1957 conspiratorial acts. However, while it was a coconspirator in the Canadian pool, HRI was neither a party to the 1957 suit nor a party to the release, nor was it named in the release as one of the parties affected thereby. Nonetheless, the Court of Appeals held HRI entitled to the benefits of the release on the ground that Zenith had failed expressly to reserve any rights against HRI, and it therefore remanded the case to the District Court with directions to exclude from the judgment any damages caused by pre-1957 conduct. We again conclude that the Court of Appeals erred.

Three rules have developed to deal with the question whether the release of one joint tortfeasor releases other tortfeasors who are not parties to or named in the release. The ancient common-law rule, which was grounded upon a formalistic doctrine that a release extinguished the cause of action to which it related, was that a release of one joint tortfeasor released all other parties jointly liable, regardless of the intent of the parties. See, *e. g., Western Express Co. v. Smeltzer,* 88 F. 2d 94,

---

controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims and demands whatsoever, in law, in admiralty, or in equity, which against said *.............., its subsidiaries and their respective successors and assigns, said Zenith Radio Corporation and The Rauland Corporation and each of them ever had, now has or which each of them and their respective subsidiaries, successors and assigns, hereafter can, shall or may have for, upon or by reason of any matter, cause or thing whatsoever from the beginning of the world to the day of the date of these presents, not including however, claims, if any, for unpaid balances on any goods sold and delivered.

"*Insert

" 'Radio Corporation of America,' or

" 'General Electric Company,' or

" 'Western Electric Company.'

"This release may not be changed orally."

95 (CA6 1937); *American Ry. Express Co.* v. *Stone,* 27 F. 2d 8, 10 (CA1 1928); *Barrett* v. *Third Avenue R. Co.,* 45 N. Y. 628, 635 (1871); *Ellis* v. *Esson,* 50 Wis. 138, 146, 6 N. W. 518, 519 (1880). While this Court has referred to this rule in cases where the rights of the litigants were controlled by state or federal common law, see *Chicago & Alton R. Co.* v. *Wagner,* 239 U. S. 452, 456–457 (1915); *United States* v. *Price,* 9 How. 83, 92 (1850); *Hunt* v. *Rhodes,* 1 Pet. 1, 16 (1828); we are cited to no case where we have applied the rule to a statutory cause of action created under federal law. Indeed, we have expressly repudiated the rule. See *Aro Mfg. Co.* v. *Convertible Top Co.,* 377 U. S. 476, 501 (1964). Cf. *Birdsell* v. *Shaliol,* 112 U. S. 485, 489 (1884). Moreover, in the lower federal courts, causes of action based upon federal statutes have generally been governed by one of the other two rules. The first of these rules provides that, although a release of one coconspirator normally releases all others, it will not have such an effect if a plaintiff expressly reserves his rights against the others. This rule, which has been adopted with some variation by statute in 21 States,[11] by judicial decision in others, see, *e. g., Mc-*

---

[11] The Model Joint Obligations Act, 9B U. L. A. 355, which has been adopted in regard to tort claims by four States, is most similar to the rule stated in the text. It provides that a release of an obligor shall release co-obligors to the full extent of the obligor's original liability, § 5 (a), unless the amount of that liability is not known to the obligee, § 5 (b), or the obligee expressly reserves his rights against the co-obligors. § 4. The four States adopting the act are Nevada, Nev. Rev. Stat., c. 101 (1967); New York, N. Y. General Obligations Law §§ 15–101 to 15–109 (1964); Utah, Utah Code Ann. §§ 15–4–1 to 15–4–7 (1953); Wisconsin, Wis. Stat. §§ 113.01 to 113.10 (1967).

The Uniform Contribution among Tortfeasors Act, 9 U. L. A. 233, reverses the presumption arising from the absence of an express provision in the release. It enacts that "[a] release by the injured person of one joint tortfeasor . . . does not discharge the other tortfeasors unless the release so provides . . . ." § 4. The eight States that

*Kenna* v. *Austin,* 77 U. S. App. D. C. 228, 233–234, 134 F. 2d 659, 664–665 (1943) (announcing D. C. law); *Riley* v. *Industrial Finance Service Co.,* 157 Tex. 306, 311, 302 S. W. 2d 652, 655 (1957); and by the First Restatement, see Restatement, Torts § 885 (1) (1939); has been applied in a number of antitrust cases. See, *e. g., Miami Parts & Spring, Inc.* v. *Champion Spark Plug Co.,* 402 F. 2d 83, 84 (CA5 1968); *Twentieth Century-Fox Film Corp.* v. *Winchester Drive-In Theatre, Inc.,* 351 F. 2d 925, 931 (CA9 1965); *Dura Electric Lamp Co.* v. *Westinghouse Electric Corp.,* 249 F. 2d 5, 6–7 (CA3 1957). It was this rule that the Court of Appeals followed in the opinion below. A final rule, which has gained support in several recent decisions and been adopted by the American Law Institute in a tentative draft of the Second Restatement of Torts, provides that the effect of a release upon coconspirators shall be determined in accordance with the intentions of the parties. See *Winchester Drive-In Theatre, Inc.* v. *Twentieth Century-Fox Film Co.,* 232 F. Supp. 556, 561–563 (ND Cal. 1964),

---

have adopted the Uniform Act are Arkansas, Ark. Stat. Ann. §§ 34–1001 to 34–1009 (1947); Delaware, Del. Code Ann., Tit. 10, §§ 6301–6308 (1953); Hawaii, Hawaii Rev. Laws §§ 246–10 to 246–16 (1955); Maryland, Md. Ann. Code, Art. 50, §§ 16 to 24 (1957); New Mexico, N. M. Stat. Ann. §§ 24–1–11 to 24–1–18 (1953); Pennsylvania, Pa. Stat. Ann., Tit. 12, §§ 2082–2089 (1967); Rhode Island, R. I. Gen. Laws Ann. §§ 10–6–1 to 10–6–11 (1956); South Dakota, S. D. Comp. Laws §§ 15–8–11 to 15–8–22 (1967). Two States—Massachusetts and North Dakota—have adopted a slightly different 1955 revision of the Act. See Mass. Gen. Laws Ann., c. 231B, §§ 1–4 (Supp. 1971); N. D. Cent. Code §§ 32–38–01 to 32–38–04 (1960). Other States adopting statutes affecting the common law of release are Alabama, Ala. Code, Tit. 7, § 381 (1940); California, Cal. Code Civ. Proc. §§ 875–880 (Supp. 1970); Louisiana, La. Civ. Code Ann., Art. 2203 (1952); Michigan, Mich. Stat. Ann. § 27A.2925 (1962); Missouri, Mo. Rev. Stat. § 537.060 (1953); Montana, Mont. Rev. Codes Ann. § 93–8108 (1964); West Virginia, W. Va. Code Ann. § 55–7–12 (1966). The statutes last listed deal generally with the construction of instruments in suit and with the effect and form of releases in particular.

rev'd, *Twentieth Century-Fox Film Corp.* v. *Winchester Drive-In Theatre, Inc., supra; Young* v. *State,* 455 P. 2d 889 (Alaska, 1969); *Breen* v. *Peck,* 28 N. J. 351, 146 A. 2d 665 (1958); Restatement (Second), Torts § 885 (1) (Tent. Draft No. 16, 1970); 12 Vand. L. Rev. 1414, 1416–1417 (1959).

We recently adopted the final rule giving effect to the intentions of the parties in *Aro Mfg. Co.* v. *Convertible Top Co., supra,* a patent infringement case. The agreement in that case expressly provided for the release of "Ford, its associated companies . . . [and] its and their dealers, customers and users of its and their products" from all past and future infringement claims. 377 U. S., at 493. The document, however, did not expressly reserve the releasor's rights against anyone. The issue in the case was whether Aro, a contributory infringer which did not fit within any of the special categories enumerated in the release, was nonetheless liable for its past contribution to infringements. The District Court had found that the parties had not intended to release contributory infringers such as Aro, and, despite the absence of an express reservation of rights against such infringers, we accordingly held that Aro was not entitled to benefit from the release. We concluded that a release, "which clearly intends to save the releasor's rights against a past contributory infringer, does not automatically surrender those rights." *Id.,* at 501.

We perceive no reason to follow a different rule in antitrust litigation. Indeed, of the three available rules, the rule adopted in *Aro* is most consistent with the aims and purposes of the treble-damage remedy under the antitrust laws. We must keep in mind the multistate and multiparty character of much private antitrust litigation; often, defendants who have conspired together must be sued in a number of different States if all are to be reached, and, while defendants in some States may

be willing to enter into settlements, defendants in others may not. To adopt the ancient common-law rule would frustrate such partial settlements, and thereby promote litigation, while adoption of the First Restatement rule would create a trap for unwary plaintiffs' attorneys. The straightforward rule is that a party releases only those other parties whom he intends to release. Our conclusion that this is the appropriate rule for giving effect to releases under the antitrust laws is further buttressed by the Restatement's abandonment in a tentative draft of the rule requiring express reservation of rights in order to save them, and its adoption of the rule to which we adhere. See Restatement (Second), Torts § 885, Comments *a–d* (Tent. Draft No. 16, 1970).

The intention of the parties to the 1957 release is absolutely clear from the contract made prior thereto in which they agreed to exchange releases.[12] That contract expressly provided for releases "to bind or benefit" the party and "the parent and subsidiaries of the party giving or receiving such release ('subsidiaries' to include corporations in which the party has stock ownership of 50% or more)." [13] We accordingly have no hesitancy in

---

[12] Resort may be had to the contract in construing the release since the parole evidence rule is usually understood to be operative only as to parties to a document, and HRI here was not a party to the release. See *Stern* v. *Commissioner*, 137 F. 2d 43, 46 (CA2 1943); *O'Shea* v. *New York, C. & St. L. R. Co.*, 105 F. 559, 562–563 (CA7 1901); Restatement (Second), Torts § 885, Comment *d* (Tent. Draft No. 16, 1970). See generally 9 J. Wigmore, Evidence § 2446 (3d ed. 1940).

[13] The contract provided in relevant part:

"1. . . . RCA, GE and Western Electric each to grant Zenith and Rauland, respectively, a general release and Zenith and Rauland each to grant RCA, GE and Western Electric, respectively, a general release, each such release, to the extent either party may request, to bind or benefit the parent and subsidiaries of the party giving or receiving such release ('subsidiaries' to include corporations in which the party has stock ownership of 50% or more)."

holding that HRI, which was neither a party to the 1957 release nor a parent or subsidiary of a party, is not now entitled to the benefits of that release.

Of course, to the extent that the $10,000,000 settlement which Zenith received in return for the 1957 release was understood by the parties to provide compensation for future damages that Zenith anticipated it would suffer during 1959–1963 as a result of the pre-1957 conduct of the Canadian pool, HRI would have available to it a defense of payment, for it is being ordered by the District Court to make full payment for all the 1959–1963 damages inflicted by all the members of the pool. It is settled that, entirely apart from any release, a plaintiff who has recovered any item of damage from one coconspirator may not again recover the same item from another conspirator; the law, that is, does not permit a plaintiff to recover double payment. See *Aro Mfg. Co.* v. *Convertible Top Co., supra,* at 502–503 (plurality view); *McKenna* v. *Austin, supra,* at 234, 134 F. 2d, at 665; Restatement, Torts § 885 (3) (1939); W. Prosser, Torts § 46 (3d ed. 1964). However, the record below indicates that a defense of payment could not here be sustained for, while the 1957 release did extend to future damages, the undisputed and unimpeached testimony of Zenith's witnesses was that the $10,000,000 settlement was understood by the parties as compensation only for Zenith's damages up to the date of the release. Thus, it is not surprising that, although HRI did advance a claim of payment upon its post-trial motion in the District Court, it has made no such argument in this Court. Since the claim was untimely presented below, was not pressed here, and is not sustainable on the facts contained in the record, we see no basis for its further consideration.

The judgment of the Court of Appeals is reversed, and

the case is remanded, with instructions that the Court of Appeals reinstate the judgment of the District Court with respect to the Canadian market.

MR. JUSTICE HARLAN, with whom MR. JUSTICE STEWART joins, concurring in the result.

My review of the record in this case has left me with the firm conviction that the trial judge rejected Hazeltine's proffered defenses of release and the statute of limitations on the ground that they were too belatedly raised. I agree with the Court that such a course was within the trial judge's sound discretion. I therefore find it unnecessary to express any view on the remaining, difficult issues which the Court discusses.

A consideration of the posture of the case at the time of the trial judge's ruling facilitates an understanding of the record. Two years after the filing of Zenith's counterclaim, one year after the close of evidence, nine months after the filing of Hazeltine's post-trial brief, and two months after the trial judge had made preliminary findings of fact and conclusions of law, Hazeltine, represented by new counsel, raised for the first time its defenses of release and the statute of limitations. It also sought to dispute the quality and the sufficiency of the proof of damages with respect to the Canadian market, and it raised the issue of governmental embargoes in the English and Australian markets.

The District Judge heard two days of argument, covering nearly 200 pages of the Appendix, on both the merits of the contentions and the equity of allowing Hazeltine to raise them so belatedly. There were three main links in the chain of Hazeltine's reasoning in support of its contention that it should be allowed the benefit of the release and the statute of limitations. First, the defenses were meritorious and would bar a large portion of the enormous potential recovery. Second, Hazeltine's late-

ness in raising the defenses should be excused because Zenith's counterclaim and supporting affidavit gave no notice that Zenith intended to rely on any activities occurring before the filing of the answer in 1961, which was well within the limitation period under any theory. Third, Hazeltine should be excused for failing to spot the alleged shift in Zenith's theory of recovery during the course of the trial because Hazeltine's trial counsel was primarily a patent lawyer who was not completely at home in the antitrust field. App. 68–69, 72–74, 156–162.

The District Judge on at least three occasions observed that Hazeltine had been put on notice of Zenith's theory by the allegations of the counterclaim itself and by the pretrial briefs.[1] He repeatedly commented on trial counsel's failure to raise the defenses of release and the statute of limitations,[2] and in the course of colloquy more

---

[1] For example: "Mr. Kayser [Hazeltine's counsel]: . . . it was not until during the trial, after we had the long Dodds affidavit and all of this testimony that suddenly, gradually this new theory starts to creep in, this new theory where we go back and try to recover again based on these allegedly wrongful acts many, many years ago.

"The Court: I must assume, to go along with that, that counsel at that time didn't read the pretrial brief which clearly set out, prior to the trial, this theory that you were taken by surprise by during the course of the trial." App. 158. See also App. 87, 144.

[2] For example: "The Court: . . . [Reads from Hazeltine's posttrial brief.]

"Do you differ with counsel's statement, your prior counsel's statement 90 days after proofs were closed?

"Mr. Kayser: As to what the issues were that were presented in this case, yes, your Honor, I do. I most definitely do.

"The Court: Of course, you know by now that this is a new theory on your behalf.

"Mr. Kayser: Your Honor, I don't think it is a new theory. I think that——

"The Court: I mean, at least it wasn't advanced in this brief filed June 8, 90 days after the proofs closed.

"Mr. Kayser: Your Honor, we fully recognize the fact that the

directly addressed to Hazeltine's other contentions he emphasized the necessity for trial counsel to prepare his case if the client was not to suffer.[3]  After counsel for

trial counsel did not realize what was happening to him.  We fully realize that fact.  If we had realized it——

"The Court: I mean, he didn't even realize it 90 days after the proofs were over.

"Mr. Kayser: Yes, your Honor.  I quite agree." App. 72.

Later the following colloquy occurred:

"The Court: Do you agree with the theory that sometime litigation must end?

"Mr. Kayser: Yes, your Honor.

"The Court: And these offers of proof [with respect to embargoes by the English and Australian Governments] are now being made more than one year after the proof closed on this case?

"Mr. Kayser: Your Honor, this I think is one of the most unusual cases that will come into a Courtroom, in that we have here, as I think we can demonstrate—without basis we have here the danger of a judgment of almost forty-nine million dollars which will spell corporate death, which is subject to the affirmative defenses of limitations and of releases. . . .

"The Court: I just got through instructing a jury that in deliberating on their verdict, they should not take into consideration either sympathy or prejudice.

.      .      .      .      .

"Mr. Kayser: I submit most respectfully to this court that this court should take into account equity.  This is not a matter of sympathy.  This is a matter of equity and a matter of justice; that this judgment, which will spell the death of this corporation, has had absolutely no basis whatsoever.  It is subject to affirmative defenses.  It was accomplished by a subtle switch in theory.  Maybe it should have been caught; maybe it shouldn't.  But is your Honor going to penalize this corporation——

"The Court: I mean, it wasn't even caught 90 days after the proofs closed.

"Mr. Kayser: I agree, that's true.  I agree.  This is a very unusual case; we recognize that.

"The Court: You may proceed." App. 108–109.  See also App. 71–76 *passim*, 158–161.

[3] For example: "The Court: . . . underlying what you are saying [with respect to the embargoes] is what is said so frequently in

Zenith had presented his argument,[4] the District Judge heard Hazeltine's rebuttal, App. 223–250, with only one substantive question: "You do agree that the statute of limitations can be waived. You agree to that, don't you?" App. 237.

At the conclusion of his rebuttal argument, Hazeltine's attorney moved for leave to file "our affirmative defenses as a formal pleading of release and statute of limitations," and also moved to dismiss the counterclaim on the basis of those defenses. App. 250. The following colloquy then occurred:

> "The Court: Mr. McConnell [Zenith's counsel], do you care to address yourself very briefly to those two motions he just made? You will be limited to that.
> "Mr. Kayser: Sir?

appeals in criminal cases, that they are where they are by virtue of incompetence of counsel.

"Now, there a person's liberty is involved, and what do the courts say in regard to this plea of incompetency of counsel?

"They say, first, was he counsel of your choice rather than appointed counsel? And if he was, the courts say, in regard to keeping men incarcerated and depriving them of their liberty, that unless the trial conducted by counsel of the prisoner's choice was such a farce, such a fraud that justice would be horrified by the result, that since you are represented by counsel of your choice, why, agreed that he might not be the greatest in the world, but he was your lawyer and you picked him out. You are going to have to remain incarcerated for the balance of your term.

"Now, how do we get around that analogy in this case?" App. 140–141.

Hazeltine's attorney responded in terms of his theory of surprise, whereupon the District Judge answered that federal procedure was based on notice pleading and in his opinion Hazeltine had been put on notice. App. 141–144.

See also, e. g., App. 116, 121–123, 146, 155.

[4] App. 169–223. The District Judge asked for Zenith's views on the merits of the proposed defenses, but he did not press counsel on his reply. App. 186, 189, 193.

"The Court: Mr. McConnell—the ones that have to do with seeking to file these new pleadings on the statute of limitations.

"Mr. McConnell: Well, the statute of limitations—this case is clearly distinguishable from the Emich case——

"The Court: All he is doing is asking leave to file, and that is the only thing I wish to have you address yourself to.

"Mr. McConnell: I think it's too late. He can make it for the record, but to actually file them in this case, the record is made. The case has been closed.

"The Court: Well, the record will show that leave is given to file them at this time, after proofs are closed and after findings have been made."

[The District Judge then stated how much he had enjoyed the argument of the past two days and complimented counsel on their presentations.]

"The Court at this time is prepared to enter the final judgment and decree offered with the exception of . . . [the damages allegedly suffered in England and Australia.]" App. 250–251.

The judge then indicated that he would reopen the record to receive additional evidence with regard to the embargoes in England and Australia, but that the scope of the inquiry would be narrowly limited, and in particular no relitigation of facts adduced at trial would be permitted. The judge explained, "I do feel that in order to satisfy myself, in order to do equity in this matter, that I would like, to the limited extent expressed, a reopening in regard to the matters that I have indicated that do trouble me by virtue of the offers of proof that have been made and the statements that have been made in regard solely to Australia and England." App. 252–253. Except for giving Hazeltine's counsel five days

in which to file his affirmative defenses, the judge made no other relevant comments in ruling on the motions.

I find it impossible to believe that the judge ruled thus summarily on the merits of the complicated issues of antitrust law to which this Court devotes 15 printed pages. I also find it highly unlikely that, without a word of explanation for departing from the sentiments he expressed during argument, the judge intended to forgive Hazeltine's failure to raise the defenses earlier. To be sure, he must have considered the merits sufficiently to satisfy himself that refusal to allow Hazeltine to raise these defenses worked no gross inequity. See Fed. Rule Civ. Proc. 15 (a). I remain convinced, however, that he rejected the defenses only as untimely raised.

Believing that the Court of Appeals clearly erred in reaching the opposite conclusion,[5] I concur in the judgment of the Court on that ground.

---

[5] The opinion of the Court of Appeals gives no indication that its attention was drawn to the remarks of the District Judge during Hazeltine's argument in chief, which cast light on his ruling on the motion for leave to file. Its entire discussion of the basis for the District Court's action reads as follows:

"Zenith's counsel objected to the filing of the defenses on the ground that they came too late and were waived. The district court, however, permitted the defenses to be filed and thereafter denied HRI's motion for judgment based on the defenses. . . . [The Supreme Court left open the question whether this ruling was on the merits.] It is our view that the court's ruling was not on the basis of waiver, but because the defenses on their merits did not bar Zenith's recovery." 418 F. 2d, at 23–24.