Windell **PERKINS**, Plaintiff,

v.

Thomas K. **NASH**, et al., Defendants.

Civ. No. 87–2115 (RCL).

United States District Court, District of Columbia.

July 29, 1988.

Amended Aug. 16, 1988.

Daniel S. Greenberg, Washington, D.C., for plaintiff.

Richard F. Boddie (argued), Merritt Lee Murry (with him on the brief), Slocum, Boddie & Murry, Falls Church, Va., for defendant Nash.

## MEMORANDUM OPINION AND ORDER

LAMBERTH, District Judge.

Plaintiff Windell Perkins brings this suit arising out of a loan transaction in which he and his wife were the borrowers, against defendant Thomas K. Nash, the lender. Also named as defendants are Barioux Trust (a transferee of the note signed by the Perkins pursuant to the loan), and various other unnamed defendants who allegedly participated with Nash in a scheme to defraud Mr. and Mrs. Perkins. In particular, Perkins alleges fraud, breach of fiduciary duty, and unjust enrichment; violation of various portions of the D.C. Consumer Protection Act, 6 D.C.Code Ann. § 28–3904 (1981); and violation of federal statutes, including the Truth–in–Lending Act, 15 U.S.C. § 1601, *et seq.* (1982), and the Racketeer Influenced and Corrupt Organizations Act, "RICO", 18 U.S.C. § 1962(c) (1982). In addition, Perkins seeks an accounting of all monies he paid to defendants. Nash has moved to dismiss and for summary judgment. No other defendant has been served or responded to plaintiff's complaint.

FACTS [1]:

In 1979, a salesman called on plaintiff Windell Perkins at his home, offering to sell him storm windows and to contract to perform various repairs to his house. Perkins said he was interested in the storm windows, but could not afford them. In the course of their conversation, Perkins indicated he also needed money for child support and to pay tuition for his daughters' schooling. The salesman promised to put him in touch with people who could finance whatever he needed.

A few days later, Perkins was contacted by an unknown defendant, "John Doe", who said he belonged to an organization that could help him with his financial situation. Shortly thereafter, he and Perkins went to the office of defendant Thomas K. Nash for a meeting, during which Perkins told Nash he needed $15,000 to meet his child support obligations and to finance his daughters' schooling. Nash indicated such a loan could be arranged.

---

**1.** Unless otherwise indicated, the following recitation of facts is taken from Plaintiff's Answers to Defendant Nash's Interrogatories, ·answer 6(c). For purposes of this decision, the Court accepts plaintiff's version of the facts.

About a week later, Nash called Perkins and told him that the people with whom he was negotiating the loan required that it be a commercial loan as a condition to financing it. In any event, said Nash, such a loan could be obtained more quickly than a personal loan. Perkins asked what a commercial loan was, and Nash responded by asking how many people lived in Perkins' house. Perkins said there was himself and his present wife, together with two children related in some unspecified way to his wife; the children's mother was paying Perkins $90 per month for their room and board. Then said Nash, Perkins could say it was a commercial loan for house repairs, based on the notion that the house was being rented out.

About a week later, on January 22, 1980, Perkins and his wife went to Nash's office to obtain the loan, the funds for which Nash succeeded in obtaining from another unnamed defendant, "Richard Roe." Nash presented three documents for execution, including an affidavit, a promissory note, and a deed of trust to secure the note. According to Perkins, Nash made certain oral representations about the terms of the loan, and then told Perkins what to write on the documents. A copy of the note and affidavit are attached to Perkins' complaint.

As can be seen, the two documents contain differing versions of the length of the loan, the affidavit saying "the note is due in *two years*" while the note itself says the entire balance is due in five years. Enigmatically, both Mr. and Mrs. Perkins wrote their initials by the five years term on the note, as if reinforcing their assent, while Mr. Perkins nonetheless filled in the two year term on the affidavit.

More important to this action are the disparities between the actual terms contained in the loan documents, and what Nash allegedly told the Perkins such terms would be. Nash had said the interest rate would be 16% or 18% (Perkins does not now recall which), while the note specifies 12% for the first year and 30% thereafter. Nash said the total interest charged would be $4,768 on a principal loan amount of $15,000, for a total repayment amount of $19,768. The note indicates that $19,768 was only the principal amount. Finally, Nash said that the entire loan would be paid off after one year of monthly payments of approximately $197 plus one more year of monthly payments of approximately $494 (for a total of about $8,292); however, the affidavit indicates the specified principal sum of $19,768 would still be due at the end of such payments, and the note indicates that three additional years of the higher monthly payment would be due, and that such payments were for interest only, with the specified principal sum of $19,768 due at the end of the five year term.

Perkins offers as an explanation that he did not read the documents he signed because he believed Nash had fully explained their terms to him. However, many of the pertinent terms which Perkins says were misrepresented to him were actually written in by Perkins himself. On the affidavit, he filled in the blanks of the following sentence. "The face amount of the note is *$19,768* which is more than the proceeds which is [sic] *$15,000.*" He also filled in the interest rates of 12% and 30% which he now claims Nash misrepresented to him. Further, he wrote "(interest only)" in the blanks following the descriptions of his monthly payments. Perkins contends that he filled in these terms at Nash's direction without understanding their import.

In addition, Perkins complains that Nash also failed to inform him that by taking out a business loan he was losing the advantages conferred by various consumer protection statutes.

After executing the documents, Perkins received the $15,000 loan. Contrary to another statement he wrote on the affidavit, he did not plan to use the loan proceeds for "Repairs/Rental Apartments" or any other colorable business purpose; rather, they were to be used to pay child support and tuition. Complaint ¶ 22.

Within a year, Perkins began falling behind on his loan repayments. He has produced twelve dunning notices sent him by Nash's office, beginning on January 2, 1981 and continuing until July 31, 1984.

Plaintiff Exhibits to Answers to Defendant's Interrogatories, Nos. 1–13. Their basic tenor is the same: that Perkins was overdue by a certain amount, ranging from $693.00 to $2,688.46; that foreclosure proceedings would be initiated unless he brought his account up to date; and that such foreclosure proceedings would entail additional costs for which Perkins would be liable. Three of the notices suggested he attempt to obtain re-financing.

In January of 1982, approximately two years after taking out the loan, Nash told Perkins for the first time that the monthly payments he had been making were for interest only, and that he still owed the principal amount of $19,768 which now was due. Perkins told Nash he did not realize that was what the documents required, and said he didn't have that kind of money. Nash told him of some people who could refinance his loan; however, Perkins chose to continue to make monthly payments, attempting to bring his account current in order to forestall Nash's calling the loan.

Evidently he succeeded for awhile: the record contains no dunning notices for most of 1982. But they started up again on November 29, 1982 and continued sporadically into 1984. The last dunning notice, dated July 31, 1984, stated that foreclosure proceedings would begin on August 7, 1984, that Perkins was $2,100.60 overdue on the note, and that it must be paid immediately.

Sometime after that (plaintiff does not indicate when), Perkins secured refinancing and paid off the $19,768 Nash claimed he owed. He filed this lawsuit on July 30, 1987.

DISCUSSION

The essence of Perkins' claim is that Nash engaged in a fraudulent scheme in which he orally misrepresented the terms of a written loan agreement in order to induce Perkins to sign it, somehow diverting him from reading or understanding its terms (many of which were filled in by Perkins himself). Then two years later, when Perkins thought he had paid off most of the loan, Nash pointed out to him what the terms of the signed agreement actually said and convinced Perkins that he was bound by the stiffer written terms, which meant he had been paying interest only and still owed the entire face amount of the loan.

It is a curious complaint, to say the least. Perkins claims he believed he was receiving a $15,000 loan, against which he would be required to repay $19,768, such repayment to be in monthly installments over two years totaling less than $9,000. He does not deny that he signed the loan documents, or that he filled in or initialed the essential terms which he now claims were misrepresented to him. There is no claim that he couldn't read or understand the documents, or that he was unduly pressured into signing them. Further, although Perkins claims breach of fiduciary duty by Nash, the Court finds no facts averred in the pleadings or presented with the motion papers which would indicate the loan was anything more than an arm's length transaction. It is noteworthy also that Perkins himself misrepresented the purpose of the loan as being at least partly for an unintended business purpose.

But whatever the substantive weaknesses of Perkins' complaint, the Court reaches only the RICO claim and the statute of limitations issue at this stage of the litigation, for several reasons. First, because a fraud action may lie even where a plaintiff has signed a contract, if the contents thereof were fraudulently misrepresented to him, *see Stern v. Moneyweight Scale Co.*, 42 App.D.C. 162, 165 (1914), and this is so regardless of how "transparent and implausible" the inducement was, so long as the plaintiff was genuinely deceived. *Saylor v. Handley Motor Co.*, 169 A.2d 683, 685 (D.C.1961). Second, even though Perkins himself may have had "unclean hands" due to his own misrepresentation of the purpose of the loan, this issue was only raised in passing by defendant, and was not adequately briefed or supported with case law for consideration by the Court. Finally, it appears that the statute of limitations is dispositive of all counts, save Perkins' RICO claim.

## A. *The RICO Claim*

■ Perkins claims that the above allegations constitute a civil RICO violation under 18 U.S.C. § 1962(c) (1982) [2]. In order for Perkins to state a claim under the statutory formulation, he must allege sufficient facts to show that defendants conducted or participated in a "pattern of racketeering activity." This requires at minimum two acts of racketeering activity, as defined in § 1961(1), plus something more. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985), *Lipin Enterprises, Inc. v. Lee*, 803 F.2d 322, 323 (7th Cir.1986).

Perkins has not stated *which* of the racketeering acts under § 1961(1), or "predicate acts" as they are called in the case law, he is alleging pursuant to his RICO claim. It appears that the only one which might apply to these facts would be mail fraud in conjunction with the mailing of the dunning notices. Since 13 such notices appear to have been sent, this constitutes a sufficient number of predicate acts to state a RICO claim, provided there is also "something more."

What constitutes "something more" is the subject of much discussion in the case law. *Lipin Enterprises* at 323–324. Relevant factors include the number and variety of predicate acts and the length of time over which they were committed, the number of victims, the presence of separate schemes, and the occurrence of distinct injuries. *Morgan v. Bank of Waukegan*, 804 F.2d. 970, 975 (7th Cir.1986).

Here, Perkins alleges he is the single victim [3] of a single scheme by defendants to defraud him of money in a single loan transaction, which certainly indicates lack of a "pattern." Further, the fact that several dunning notices were mailed by defendant in an attempt to collect on a fraudulently induced loan is not sufficient to raise a single loan transaction entered into with a single plaintiff to a pattern of racketeering activity.

In *Lipin Enterprises, supra*, plaintiff was the "unhappy buyer" of a leasing company, alleging that the seller and various other parties (accountants, lawyers and several banks) duped him into paying more for the company than it was worth. Plaintiff alleged a number of fraudulent statements by defendants concerning the company's net worth and inventory of leases, and the district court found at least twelve separate acts of mail fraud pursuant to the fraud. But this was not enough to constitute a pattern, the court reasoning that the pattern requirement was intended to target defendants who "regularly" commit the predicate acts set out in § 1961(1). "RICO is not 'aimed at the isolated offender.' *Sedima*, 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14 (quoting 116 Cong.Rec. 35, 193 (1970) (Statement of Rep. Poff)). There must be some indication of a 'threat of continuing activity' by the defendants, not just one instance of fraud with a single victim." *Lipin* at 324. *See Bros v. Culver*, 650 F.Supp. 874 (D.D.C.1987) (allegation of racketeering activity that included telephone calls misrepresenting the condition of a building's roof during negotiations for its lease, together with phone calls and letters afterwards attempting to wrongfully collect payment on the lease, were insufficient to constitute a pattern of racketeering activity).

The Court notes that Perkins has moved to compel further discovery regarding the identities of "John Doe" and "Richard Roe" (the unnamed defendants who put Perkins in contact with Nash, and furnished the money for the loan, respectively), as well as anyone else involved in the loan transaction with Nash. But the involvement of such persons would do nothing to alter the essence of Perkins' claim: that he was the single victim of a single,

---

**2.** § 1962(c) states: "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a

pattern of racketeering activity or collection of unlawful debt."

**3.** Although the loan documents were signed by two people, Mr. and Mrs. Perkins, there is no allegation of harm distinct to her. Indeed, only Mr. Perkins is a party to this suit.

fraudulent loan transaction, which falls short of a RICO violation.

Therefore, the Court finds that Perkins' complaint is insufficient to state a claim under § 1962(c).

### B. *Statute of Limitations*

■ The parties agree that, apart from Perkins' RICO claim, the longest period of limitation governing his various other claims is the three year limitation under 4 D.C.Code Ann. § 12–301(8) (1981), which applies to fraud claims brought under local law here. *Fontana v. Aetna Casualty & Surety Co.*, 363 F.2d. 297, 298 (D.C.Cir. 1966). Plaintiff filed this action on July 30, 1987; thus, if the statutory period began to run anytime before July 31, 1984, then plaintiff's non-RICO claims are barred (absent equitable tolling, which has not been raised by plaintiff here).

### 1. Accrual of Perkins' Cause of Action

"The statute of limitations for a cause of action based upon fraud or concealment does not begin to run until the date on which the defrauded party ascertains, or with the exercise of due diligence should ascertain, the material facts upon which the claim is based." *Hartford Life Insurance Co. v. Title Guarantee Co.*, 520 F.2d. 1170, 1174 (D.C.Cir.1975). Contained in this formulation are two elements a court must address in determining whether the limitation period has begun to run by a certain date: first whether the facts material to plaintiff's claim had occurred by that date; and secondly, whether plaintiff knew or should have known of them. Given that fraud by its very nature entails concealment, the second factor is most often the one courts focus upon. But disposition of the present case turns instead on the first factor.

Apart from the question whether a plaintiff has been diligent in ascertaining facts upon which his claim is based, it is generally held that a cause of action will accrue, and start the limitation period running, when the elements of a tortious act by defendant and a legal injury to plaintiff coalesce. 1 S. Speiser, C. Krause & A. Gans, *The American Law of Torts*, § 5:27 at 881 (1983), and cases cited therein. It is clear that plaintiff need not have suffered all injury to which he will ultimately fall prey. *Fitzgerald v. Seamans*, 553 F.2d. 220, 227 (D.C.Cir.1977) ("the fact of injury was sufficiently plain for [plaintiff's] cause of action to accrue even though the extent and precise nature of the injury had not yet developed.")

On the other hand, the question whether all tortious acts by the defendant need to have occurred to start the period running is quite different. As long as a defendant keeps committing wrongful acts resulting in injury, plaintiff will be able to bring some cause of action within the statutory period dating from such wrongs. Under ordinary circumstances, plaintiff will only be able to recover for injuries resulting from wrongs that occurred during the preceding limitation period, and not those occurring before. *See e.g., Hanover Shoe Inc. v. United States Machinery Corp*, 392 U.S. 481, 502 n. 15, 88 S.Ct. 2224, 2236 n. 15, 20 L.Ed.2d 1231 and accompanying text (1967). But where the wrongs amount to a "continuing tort," plaintiff will be able to recover for injuries resulting from all wrongs by the defendant, as long as some of them occurred within the limitation period. *Page v. United States*, 729 F.2d. 818, 821–22 (D.C.Cir.1984).

Under the facts alleged here, Nash deceived Perkins as to the contents of the note and supporting documents he signed over seven and a half years before suit was brought, and had, some five and one half years earlier, then asserted his position that Perkins was liable on the note as it was actually written. Further, Perkins had suffered significant injury prior to three years before bringing suit. As the Court calculates it, Perkins had already repaid over $21,000 by July 30, 1984 (based on the fact that 54 months had passed since the loan was executed, during which time 12 payments of $197 were due, together with 42 payments of $494, for a total of $23,112, while the July 31, 1984 dunning notice showed he was $2,100.60 overdue, leaving $21,011.40 paid).

Thus, not only had Perkins continued making monthly payments well beyond the originally represented period of two years, but he had also made sufficient payments to now exceed the $19,768 he had originally been told was his repayment obligation. In addition, he had known for approximately two and a half years that Nash regarded him as still obligated for the full $19,768. It therefore seems clear that there were sufficient wrongs by defendant and sufficient injury to plaintiff by July 30, 1984, to start the statutory period running.

But Perkins countered at oral argument that there was one further wrong by Nash after that date: namely, his sending of the July 31, 1984 dunning notice. According to plaintiff's argument, this served to help continue the fraud; and since it occurred within the three year limitation period, and because it was part of a continuing tort by defendant, it serves to allow plaintiff to sue on all of defendant's previous alleged wrongs.

### 2. The "Continuing Tort" Doctrine

"The continuing tort doctrine constitutes a pretty well established exception to the usual rule that a statute of limitations starts to run at the time of injury." *The American Law of Torts*, § 5:27 at 888–89. Under this doctrine, plaintiff can bring his action against all of defendant's wrongful conduct, as long as any of it occurred during the limitation period.

The continuing tort doctrine appears in the case law only in certain, unusual circumstances. First, it is applied where "no single incident in a continuous chain of tortious activity can 'fairly or realistically be identified as the cause of significant harm' [making it] proper to regard the cumulative effect of the conduct as actionable." *Page* at 821–22, *citing Fowkes v. Pennsylvania R.R.* 264 F.2d. 397, 399 (3d Cir.1959).

In addition, it is intended to prevent a person from acquiring a right to continue to reap benefits from previous tortious con-

duct. *Page* at 822, *citing Fletcher v. Union Pac. R.R.*, 621 F.2d 902, 908 (8th Cir. 1980), *cert. denied* 449 U.S. 1110, 101 S.Ct. 918, 66 L.Ed.2d 839 (1981), and *Underwater Storage, Inc. v. United States Rubber Co.*, 371 F.2d 950, 955 (D.C.Cir.1966), *cert. denied* 386 U.S. 911, 87 S.Ct. 859, 17 L.Ed. 2d 784 (1967) (claim for initial misappropriation of trade secret time-barred, but recovery allowed for use during limitation period to prevent defendants from "baptiz[ing]" their original wrong).[4]

Finally, a continuing tort will often be found, under the "continuous treatment" doctrine, where it would be absurd to require a wronged patient to interrupt ongoing corrective efforts by bringing suit against her doctor, *The American Law of Torts* § 5:27 at 889–90, and cases cited therein, as well as under variations of this doctrine where a relationship requiring trust or cooperation exists between plaintiff and defendant. *Id., citing Davis v. Young*, 90 Tenn. 303, 16 S.W. 473 (1891) (seduction), and *Union Carbide & Carbon Corp. v. Stapelton*, 237 F.2d. 229 (6th Cir. 1956) (employee sued employer for subjecting him to health impairing conditions.)

The continuing tort doctrine is not applied just because plaintiff's *injury* is ongoing, provided the tortious conduct has ceased. *See Page* at 821 n. 23. In particular, when a plaintiff is first adversely affected by a defendant, the statute of limitations begins running for his cause of action to recover all damages incurred by that date, as well as all proveable damages that will flow in the future from the acts of defendant. *Zenith Radio Corp. v. Hazeltine Research*, 401 U.S. 321, 339, 91 S.Ct. 795, 806, 28 L.Ed.2d 77 (1970). To hold otherwise would defeat any sense of repose intended by the statute of limitations whenever a transaction includes a long term payment obligation. Thus, the fact that Perkins made his final balloon payment of $19,768 within the statutory period is irrelevant to a continuing tort analysis, where he had already suffered significant injury

---

**4.** The *Page* court's citation to *Underwater Storage* as an example of application of the continuing tort doctrine seems incorrect, since plaintiff

in that case was allowed to recover only for wrongful acts occurring during the statutory period. 371 F.2d at 953.

before July 30, 1984, and furthermore, knew by that date that Nash considered him liable for the additional amount which he would eventually pay. Rather, Perkins must establish that Nash continued his tortious conduct beyond July 30, 1984, and the fact that he sent a single dunning notice on July 31, 1984, fails to achieve this.

First, Perkins was not the victim of a continuous chain of tortious activity, no single incident of which can fairly or realistically be identified as the cause of significant harm. The January, 1982 conversation with Nash was a thunderbolt which shattered any notion Perkins may have had that he was close to repayment, or even that he had reduced the amount of principal owed, under the terms of the written note as now made known to him. Under Perkins' theory, every payment he made beyond the initial 24 constituted injury to him, and certainly the payments he made which exceeded $19,768 constituted injury. By July 30, 1984, he had made approximately 50 payments for over $21,000.

Further, the dunning notices did not represent an attempt by Nash to acquire a right to "baptize" tortious conduct, in the same way continued use does in the trade secret misappropriation cases. In *Underwater Storage*, 371 F.2d. at 955, the court declared that defendant could not argue that misappropriation took place outside the statutory period on the one hand, while at the same time arguing that continued use was not wrongful since the secret was now public knowledge, on the other. However in the present case, Nash was not "baptizing" an earlier wrong; he was merely asserting his belief that his earlier acts pursuant to creating the loan obligation were not wrongful to begin with.

Finally, while Perkins has claimed breach of fiduciary duty, he has neither pleaded nor produced facts indicating there was any more than an arm's length relationship with Nash. Thus, the Court finds no basis for applying the continuing tort doctrine on the basis that the continued association between Perkins and Nash was fostered in an atmosphere of trust or cooperation.

### 3. Misrepresentation of Law

■ There is, perhaps, a more fundamental reason why Nash's sending of the July 31, 1984 dunning notice does not delay the running of the statute of limitations, and which serves to distinguish more clearly the facts in *Underwater Storage* from those here. Under Perkins' theory, the dunning notices represent the second phase of the fraud, which began with their conversation in January, 1982 some two years after the loan was taken out, in which Perkins was convinced by Nash that despite his being tricked into signing the loan agreement he was nonetheless bound by its terms. At that point, the fraud had evolved from a misrepresentation of facts, i.e. the terms of the written agreement, to a misrepresentation of the legal effect of the Perkins' having signed it.

But a misrepresentation of law is ordinarily not a basis for fraud, W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton On The Law of Torts*, § 109 at 758–762 (5th ed. 1984), *citing at n. 42, Williams v. Dougherty County*, 101 Ga. App. 193, 113 S.E.2d 168 (1960) (in the absence of a fiduciary relationship, representation that particular conduct will lead to legal liability can not form a basis for fraud action, where plaintiff could have settled the question by consulting an attorney).

Although at one time based on the proposition that all people were charged with knowledge of the law, the rationale for the rule has become more realistic. "The general rule seems to have arisen rather out of a deliberate policy requiring the parties to a bargain to deal at arm's length with respect to the law, and not to rely upon one another." *Prosser and Keeton, supra*, at 759.

The exceptions to this rule do not apply here. There are no facts in the pleadings or record indicating that Nash and Perkins stood in a relation of trust and confidence such as family members do, or business partners, or an attorney and client; or that Perkins lacked access to information regarding his legal obligation under the note while Nash held himself out as having spe-

cial knowledge of that matter. *Id.* at 760–61. Any artifice or trickery by Nash was used to induce Perkins to sign the note, and had long since been revealed to him by the time of the July 31, 1984, dunning notice.

That notice was nothing more than a straightforward declaration by an interested party to an arm's length transaction regarding his rights. There is no basis for finding it was fraudulent. Neither is there any basis for finding that it delayed accrual of the cause of action for statute of limitation purposes. *Neff v. New York Life Insurance, Co.*, 30 Cal.2d 165, 180 P.2d 900, 904 (1947) (running of statute of limitations not suspended by insurer's denial of liability: concealing no fact from the insured, it was free to make such a claim; the insured, knowing all the facts which were known to defendant, was then free to litigate the issue). Further, this result is not changed by the fact that, under Perkins' theory, the dunning notices were an attempt to enforce wrongful conduct occurring previously. *See Hurick v. Lehman,* 782 F.2d. 984, 986–987 (Fed.Cir.1986) (expiration of statute of limitations on wrongful discharge action was not avoided by plaintiff's assertion that he was actually challenging subsequent refusal by Naval Correction Board to grant relief from such discharge, the court holding that such action was "auxiliary" thereto: "No matter how the appellant seeks to frame his claim, in the final analysis he is challenging his discharge, and his attempt to do so was untimely").

4. Conclusion

Despite Perkins' attempt to inculpate the conduct of defendant Nash after July 30, 1984 in order to gain relief from operation of the statute of limitations, the reality is that the outcome of a trial would depend entirely on conduct alleged to have occurred seven and one half years before suit was filed. Where Perkins pleads facts showing he was aware of such conduct five and one half years before filing suit, and was clearly injured at least three years before filing, the only result can be that he was not diligent in filing any claims he may have had with a limitation period of three years or less. To hold otherwise would be to unfairly disturb the repose to which a prospective defendant is entitled in the conduct of his affairs, and would require a jury to make sense of evidence obscured by the fading memories of witnesses.

It is therefore

ORDERED, that defendant Nash's motion for summary judgment is granted, and this case is dismissed as to defendant Nash, and it is further

ORDERED, that all outstanding discovery motions are denied as moot, and it is further

ORDERED, that plaintiff shall have 10 days from the date of this Order to show good cause why this case should not be dismissed as to all remaining defendants for failure to effect service, pursuant to Rule 4(j).

SO ORDERED.