Phillip M. **KABEALO** and Charles L. Kabealo, Plaintiffs–Appellants, Cross–Appellees,

v.

The **HUNTINGTON NATIONAL BANK,** Defendant–Appellee, Cross–Appellant.

Nos. 92–4359, 92–4368.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 6, 1993.

Decided Feb. 18, 1994.

bank violated the anti-tying provisions of the Act[1] in connection with two credit transactions, one in 1982 and one in 1984.

David A. Ison (argued and briefed), Scott A. Smith, Fusco, Smith & Mathews, Westerville, OH, for Phillip M. Kabealo.

Samuel Ronald Cook, Jr. (argued and briefed), Porter, Wright, Morris & Arthur, Columbus, OH, for Huntington Nat. Bank, and Michael Davis.

Richard Douglas Wrightsel, Emens, Hurd, Kegler & Ritter, Columbus, OH, for Christopher L. White and Donald F. Moorehead.

Before: RYAN and SUHRHEINRICH, Circuit Judges, and LIVELY, Senior Circuit Judge.

LIVELY, Senior Circuit Judge.

The plaintiffs appeal from summary judgment in favor of the defendants in this case that arose under the "anti-tying" provisions of the Bank Holding Company Act, 12 U.S.C. § 1971 et seq. (1988) (the Act). The district court held that this action was barred by the Act's four-year statute of limitations, 12 U.S.C. § 1977(1), rejecting the plaintiffs' contention that the statute of limitations was tolled under the facts of the case. We agree with the district court and, accordingly, affirm the judgment dismissing the action.

## I.

The plaintiffs Phillip and Charles Kabealo owned all the stock in Buckeye Waste Control, Inc. (Buckeye), an industrial waste hauling company. Buckeye was a customer of and frequent borrower from the defendant Huntington National Bank (the bank). The plaintiffs alleged in their complaint that the

## A.

In 1982, Phillip Kabealo discovered a landfill for sale (the Logan Landfill). When Kabealo's accountant, Robert Foster, approached the bank in October 1982 about a loan to purchase the landfill, the plaintiffs claim that the bank's loan officer refused to lend the Kabealos enough money to purchase the landfill unless Steve Hale, a business associate of the Kabealos and a customer of the bank, was joined in the deal. The bank denies that it conditioned making the 1982 loan on the Kabealos bringing in Hale. Nonetheless, on November 29, 1982, Kabealo and Hale submitted a proposal that the loan be made to Phillip Kabealo and Steve Hale, on behalf of Logan Waste Control (LWC), an Ohio corporation consisting of Kabealo, Hale and Max Gehle, the original owner of the Logan Landfill. The bank committed to the loan on or about December 1, 1982.

Shortly after purchasing the landfill, Phillip Kabealo began the application process for a "Permit to Install" (PTI) from the Ohio Environmental Protection Agency (the OEPA). Such a permit would allow the landfill, which had little available space, to be expanded and thus greatly increase its value. The administrative steps to complete the process were completed in September 1986 and the OEPA granted the permit in July 1987. According to Phillip Kabealo, he located a buyer in the summer of 1987 who wanted to purchase the Logan Landfill and was willing to pay $45.9 million. This sale could not be accomplished, Kabealo claims, because Gehle and Hale sold their interests in the landfill to another company in September of 1987 for around $3 million each. Kabealo claims that

---

1. As pertinent here, 12 U.S.C. § 1972 provides:
   (1) A bank shall not in any manner extend credit, lease or sell property of any kind, or furnish any service, or fix or vary the consideration for any of the foregoing, on the condition or requirement—
   (A) that the customer shall obtain some additional credit, property, or service from such bank other than a loan, discount, deposit, or trust service;

   . . . .
   (C) that the customer provide some additional credit, property, or service to such bank, other than those related to and usually provided in connection with a loan, discount, deposit, or trust service;
   . . . .

had he controlled 100% of LWC (and he would have if the bank had not required a co-owner), he would have made the sale at a great profit.

### B.

After LWC acquired the landfill, Buckeye continued to expand, making several acquisitions that were financed through the bank. During this time, Kabealo hired Donald Moorehead as General Manager and Christopher White as Operations Manager for Buckeye. He gave each man a 25 percent equity interest in Buckeye.

Michael Davis, a loan officer at the bank, took charge of the Buckeye account in October 1984. On October 17, 1984, Davis met with Phillip Kabealo, White and Moorehead. According to the plaintiffs, the purpose of this meeting was to discuss amortization of several Buckeye loans. According to the bank, the men discussed an additional $250,-000 loan. Notes made by Anthony Salvatore, a bank employee who was present on October 17, indicate that the meeting could have included both. On that day, Kabealo, White and Moorehead executed several documents, including a security interest in their Buckeye stock in favor of the bank.

Phillip Kabealo met with Davis again on October 18, 1984. According to Kabealo, Davis stated that the bank refused to amortize the notes unless Kabealo gave to White and Moorehead a total of fifty-two percent of the shares of Buckeye. (Since each man already owned 25 percent, this would require Kabealo to give each another 1 percent). Furthermore, according to Kabealo, Davis stated that if Kabealo did not give controlling interest in Buckeye to Moorehead and White, Davis would "flush [Kabealo] and this whole deal down the toilet."

On November 7, 1984, the Kabealos, Moorehead and White executed a close corporation agreement which accomplished the share distribution allegedly demanded by the bank. Shortly after these documents were executed, the Kabealos were fired as part of a "payroll reduction." In January of the following year (1985), the controlling shareholders removed Phillip Kabealo from the Board of Directors.

### II.

The plaintiffs filed this action on November 7, 1988, four years to the day after they executed documents giving control of Buckeye to White and Moorehead, but more than six years after the alleged improper conduct of bank employees related to the Logan Landfill. Their complaint charged that in connection with both the 1982 and 1984 transactions and others the bank conditioned the extension of credit to LWC and Buckeye on the plaintiffs' providing "additional credit, property, or services" to the bank that were not usually required for such loans.

In addition to the bank, the complaint named as individual defendants bank loan officer Davis and Buckeye stockholders White and Moorehead. The complaint included several state law claims as well as numerous claims alleging violations of the Act. After the district court dismissed the individual defendants, the bank filed a motion to dismiss pursuant to FED.R.CIV.P. 12(b)(6) for failure to state a claim. The district court denied this motion, but following discovery the bank filed a motion for partial summary judgment.

In the face of this motion the plaintiffs eliminated all claims under the Act but those related to the 1982 and 1984 transactions described above. The district court granted summary judgment on both claims, finding both barred under the Act's four-year statute of limitations. The court's judgment dismissed the federal claims with prejudice and the state law claims without prejudice. The plaintiffs appeal from summary judgment and the bank cross-appeals from the court's denial of its motion to dismiss.

### III.

We treat the parties' arguments concerning the two claims separately.

#### A. The 1982 Claim

##### 1.

The plaintiffs agree that their 1982 claim accrued in October of that year when the

bank allegedly made an unlawful demand that Steve Hale be associated with Kabealo in LWC as a condition for granting a loan to purchase the Logan Landfill. Thus, unless tolled, the four-year statute of limitations would bar a cause of action based on this claim. The plaintiffs argue, as they did in the district court, that the statute was tolled because their damages were "speculative" until LWC received the PTI in 1987. They rely on the rule announced by the Supreme Court in *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 339, 91 S.Ct. 795, 806, 28 L.Ed.2d 77 (1971), that "even if injury and a cause of action have accrued as of a certain date, future damages that might arise from the conduct sued on are unrecoverable if the fact of their accrual is speculative or their amount and nature unprovable." Applying this general rule specifically to *Zenith*, which involved a claim of a continuing conspiracy by the defendant to violate federal antitrust law, the Court stated:

> In antitrust and treble-damage actions, refusal to award future profits as too speculative is equivalent to holding that no cause of action has yet accrued for any but those damages already suffered. In these instances, the cause of action for future damages, if they ever occur, will accrue only on the date they are suffered; thereafter the plaintiff may sue to recover them at any time within four years from the date they were inflicted.

*Id.*

The plaintiffs maintain that their damages were entirely speculative so long as their request for a PTI was pending. They state that the value of a landfill depends on its size, and until it was known whether they could expand Logan Landfill its value "was somewhere between $0 and $10 million." Because their future damages were incapable of proof in October 1982, the plaintiffs argue, they could not have brought "a good faith action" then or at any time within four years. Relying on *Zenith*, they state that the cause of action as to those damages did not accrue until they became provable in 1987.

### 2.

The bank responds with several arguments. First, the bank contends that the speculative damages rule applies only to antitrust actions, not those brought under the Bank Holding Company Act. The bank points out that *Zenith* involved a continuing conspiracy in which "each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act." 401 U.S. at 338, 91 S.Ct. at 806. In a case such as this one, where the plaintiffs contend that a single, discrete act of the defendant violated federal law, the defendant asserts that the reasoning of *Zenith* should not apply.

The bank argues further that even if the speculative damages rule does apply in Bank Holding Company Act cases, the plaintiffs have utterly failed to carry their burden of proving that their damages were speculative at the time of the bank's allegedly unlawful act and for four years thereafter. They rely specifically on the fact that the plaintiffs submitted five-year projections of income and cash flow to the bank in connection with loan applications for loans to LWC. Furthermore, by the time the statute of limitations ran in 1986, the plaintiffs had operated the landfill for four years and had a history of its financial return. A fact-finder could have calculated damages reasonably from this information, taking into account the fact that a favorable ruling on the PTI request could result in greater profits.

### B. The 1984 Claim

Unlike the 1982 claim, the 1984 claim turns on the question of when the acts of the bank alleged by the plaintiff to have violated the Act occurred and thus started the period of limitations running.

### 1.

The plaintiffs argue that their cause of action for the 1984 claim accrued on November 7, 1984, when they executed the documents required to comply with the bank's demand that White and Moorehead be given a majority interest in Buckeye. Conceding, as they must, that the bank made the de-

mand on October 18, 1984, the plaintiffs argue that their injury occurred when ownership of Buckeye changed on November 7, 1984.

### 2.

The bank responds that the plaintiffs' own submissions to the district court, as well as other proof in the case, show clearly that any cause of action based on the bank's conduct with respect to the 1984 transaction occurred on October 18, 1984, at the latest. That was the date on which the bank committed the allegedly unlawful act—the demand that White and Moorehead be given 52% of the stock in Buckeye accompanied by a threat if the plaintiffs did not comply. The fact that the plaintiffs did not execute the documents · required to comply with this demand until November 7, 1984 has no significance whatever. The bank cites numerous cases for the proposition that a cause of action for violation of an anti-tying provision of federal law accrues "when a defendant commits an act."

### IV.

Again, we treat the claims separately, beginning with the 1982 claim.

### A.

■ We disagree with the bank's argument that the speculative damages rule does not apply to cases under the Act. In explaining the rationale for the rule in *Zenith*, Justice White referred to "antitrust *and treble-damage actions.*" 401 U.S. at 339, 91 S.Ct. at 806 (emphasis added). The Act provides that a person injured by violation of the anti-tying provisions of § 1972 "shall be entitled to recover three times the amount of damages sustained by him...." 12 U.S.C. § 1975. Thus, cases arising under the Act come within the explicit language of *Zenith.*

Furthermore, many courts have recognized that the purpose of the Act is to impose upon the banking industry the general restrictions of the antitrust laws. In discussing the text and legislative history of the anti-tying provisions of the Act, Judge Merritt, sitting by designation with the United States Court of Appeals for the Eleventh Circuit, wrote:

> It appears, therefore, that the purpose and effect of § 1972 is to apply the general principles of the Sherman Antitrust Act prohibiting anticompetitive tying arrangements specifically to the field of commercial banking, without requiring plaintiffs to establish the economic power of a bank and specific anticompetitive effects of tying arrangements....

*Parsons Steel, Inc. v. First Alabama Bank of Montgomery, N.A.,* 679 F.2d 242, 245 (11th Cir.1982), *rev'd on other grounds,* 474 U.S. 518, 106 S.Ct. 768, 88 L.Ed.2d 877 (1986). See also *Campbell v. Wells Fargo Bank, N.A.,* 781 F.2d 440, 443 (5th Cir.), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986) (paraphrasing *Parsons Steel* ).

The parties have not cited, nor have we found, a case under the Act in which the statute of limitations was tolled by applying the *Zenith* speculative damages rule. In *Lancianese v. Bank of Mount Hope,* 783 F.2d 467 (4th Cir.1986), the court affirmed summary judgment for the defendant bank in a § 1972 action on the ground that the statute of limitations expired prior to the filing of the suit. The court held that the plaintiff's reliance on the speculative damages doctrine was "misplaced" because they "could have reasonably ascertained their damages and presented competent proof of them." *Id.* at 470. The clear inference from the discussion of the *Zenith* rule is that in a situation where a plaintiff could *not* reasonably ascertain and present competent proof of damages in a case under the Act, the doctrine would apply.

### B.

Although we conclude that the *Zenith* rule applies to claims of tying violations under the Act, that is just the initial step in disposing of the plaintiffs' 1982 claim. As in *Lancianese,* we must determine whether the plaintiffs in the present case have shown that their damages were actually speculative. In making this determination we examine decisions involving the anti-tying provisions of federal antitrust statutes.

In *Akron Presform Mold Co. v. McNeil Corp.*, 496 F.2d 230, 233 (6th Cir.), *cert. denied*, 419 U.S. 997, 95 S.Ct. 310, 42 L.Ed.2d 270 (1974), we discussed rules that exempt parties from the effect of a statute of limitations as follows:

> Since the above rules are in avoidance of the statute of limitations, the party seeking the benefit of them has the burden of proof to establish them. All presumptions are against him, since his claim to exemption is against the current of the law and is founded on exceptions.

One of the "above rules" referred to was the speculative damages doctrine of *Zenith*.

In *Charlotte Telecasters, Inc. v. Jefferson–Pilot Corp.*, 546 F.2d 570 (4th Cir.1976), an applicant that was eventually denied a cable franchise filed suit more than four years after the last overt act of the city council refusing to reconsider its application. The plaintiff claimed that loss of future profits could not be ascertained at the time of the city council's last act and that the statute of limitations was tolled under *Zenith*. In affirming summary judgment for the defendant, the court of appeals pointed out that the plaintiff had included with its original application a projection of the number of subscribers it would attract and the gross receipts for the first five years of operation if it were awarded a franchise. *Id.* at 573. The court stated:

> Since the projections were designed to induce the council to award a franchise, the district court could conclude, in the absence of evidence to the contrary, that they were rationally based on valid assumptions. Under these circumstances, we conclude that the damages which Telecasters sought were not too speculative to prevent the cause of action from accruing at the time of the last overt act, August 7, 1967.

*Id.*

The *Charlotte Telecasters* court stated that it applied traditional rules, as prescribed by the Supreme Court, in determining whether damages are speculative. "These cases teach that when the defendant's wrong has been proven, 'the jury may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly. In such circumstances, juries are allowed to act upon probable and inferential, as well as direct and positive proof.'" *Id.* (quoting *Bigelow v. RKO Pictures, Inc.*, 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946)) (some interior quotation marks omitted).

In *Mir v. Little Company of Mary Hospital*, 844 F.2d 646 (9th Cir.1988), the court rejected an antitrust suit plaintiff's claim that the statute of limitations was tolled because its damages were speculative. In *Mir* the plaintiff argued that his damages for the defendant's denial of certain surgical privileges at its hospital could not be determined until related state court proceedings were concluded. The court held that mere uncertainty as to the *extent* of damages will not prevent recovery under the federal antitrust law. The plaintiff could have presented evidence of projected lost income. This "probable and inferential" proof would have provided a reasonable basis for calculating damages. *Id.* at 650.

The court in *Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261 (7th Cir.), *cert. denied*, 472 U.S. 1018, 105 S.Ct. 3480, 87 L.Ed.2d 615 (1985), adopted the reasoning of *Charlotte Telecasters* in rejecting the plaintiff's reliance on the speculative damages rule to exempt it from the bar of the four-year statute of limitations. The court stated that absent special circumstances a plaintiff who could rely on predicted losses should not be permitted to "wait and see" if actual losses are realized before commencing an action for an antitrust violation. *Id.* at 271.

### C.

■ Applying the foregoing principles, we conclude that the plaintiffs did not carry their burden of proving that their losses were so speculative as to excuse their failure to file this suit within the period of limitations. Their own projections and their actual experience during four years of operation would have been sufficient to provide the fact-finder with a reasonable basis for calculating their damages. If they felt that they could not present sufficiently exact evidence of damages within that time, they could have filed

828

suit and requested a stay until the administrative proceedings before the OEPA were concluded. They acted at their risk in waiting until the statute of limitations had run and the district court correctly determined that their action was barred.

## V.

■ Turning to the 1984 claim, we agree with the district court that any cause of action based on that claim accrued on October 18, 1984. Thus, the present action, which was commenced on November 7, 1988, is barred.

The Supreme Court stated in *Zenith*, "Generally, a cause of action accrues and the statute begins to run when *a defendant* commits an act that injures a plaintiff's business." 401 U.S. at 338, 91 S.Ct. at 806 (emphasis added). All courts that have written on the subject agree that it is the last overt act of the defendant, not any act of the plaintiff, that triggers the statute of limitations. We said so in *Akron Presform*, 496 F.2d at 233, and *Fontana Aviation, Inc. v. Baldinelli*, 575 F.2d 1194, 1195 (6th Cir.), *cert. denied*, 439 U.S. 911, 99 S.Ct. 281, 58 L.Ed.2d 257 (1978), and we have found no published opinion from any court that holds to the contrary.

It is immaterial that the plaintiffs did not execute the documents which formally transferred control of Buckeye to White and Moorehead until November 7, 1984. The Act is concerned with injurious actions of banks that violate its anti-tying provisions. The proscribed injury occurred when the bank made the allegedly unlawful demand on the plaintiffs, not when the plaintiffs complied.

We have examined the opinion in *Jackson v. Union National Bank of Macomb*, 715 F.Supp. 892 (C.D.Ill.1989), which both parties have cited. That opinion merely holds that any violation of § 1972 occurred "at the time of the transaction in July 1981." *Id.* at 896. From this statement the plaintiffs in the present case argue that the 1984 "transaction" was not complete until November 7. This argument has no merit. Because the plaintiffs in *Jackson* were out of time regardless of what date in July the "transaction"

occurred, it was not necessary for the court to determine the exact date. Moreover, the "transaction" referred to in *Jackson* was between the plaintiffs and the bank; the November 7, 1984, "transaction" relied upon by the plaintiffs was between them and two nondefendants. Nothing in *Jackson* detracts from the firmly settled rule that a cause of action for violation of § 1972 of the Act accrues when the defendant bank commits a prohibited act that injures the plaintiff.

## CONCLUSION

The district court properly granted the bank's motion for summary judgment. Having reached this conclusion we find it unnecessary to consider the bank's cross-appeal. AFFIRMED.