**MORTON'S MARKET, INC., and J & J Produce and Deli, Inc., Plaintiffs,**

v.

**GUSTAFSON'S DAIRY, INC., Borden, Inc., T.G. Lee Foods, Inc., Flav–O–Rich, Inc., and the Southland Corporation, Defendants.**

Nos. 93–1077–CIV–T–23B, 95–35–CIV–T–23B, 93–1264–CIV–T–23B and 94–1437–CIV–T–23B.

United States District Court,
M.D. Florida,
Tampa Division.

Oct. 31, 1997.

---

Daniel B. Allanoff, Joel C. Meredith, Meredith, Cohen & Greenfogel, P.C., Philadelphia, PA, Michael J. Freed, Mary Jane Edelstein Fait, Much, Shelist, Freed, Denenberg, Ament, Bell & Rubinstein, Chicago, IL, for Morton's Market, Inc., J&J Produce and Deli, Inc.

Alexander G. Paderewski, Paderewski & Sweeting, P.A., Sarasota, FL, Leonard Egan, Fort & Schlefer, Washington, DC, for Morton's Market, Inc.

Larry H. Evans, Larry H. Evans, P.A., Fairfax, VA, for J&J Produce and Deli, Inc.

John Andrew DeVault, III, Bedell, Dittman, DeVault, Pillans & Coxe, P.A., for Gustafson's Dairy, Inc.

Teresa D. Thebaut, Michael A. Doyle, Alston & Bird, Atlanta, GA, Morris Weinberg, Jr., Zuckerman, Spader, Taylor & Evans, Tampa, FL, for Borden, Inc.

Douglas Jules Titus, Jr., George & Titus, P.A., Tampa, FL, for T.G. Lee Foods, Inc., McCarthy Dairy, Inc.

David Gordon Hanlon, Sr., Shackleford, Farrior, Stallings & Evans, P.A., Tampa, FL, Ronald L. Gaffney, Day, Smith, Walton & Durham, Louisville, KY, John J. McLaughlin, Alagia, Day Trautwein & Smith, Louisville, KY, for Flav–O–Rich.

William F. McGowan, Jr., Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A., Tampa, FL, for Southland Corp.

Martin Lee Garcia, Hill, Ward & Henderson, P.A., Tampa, FL, Jerry L. Beane, Strasburger & Price, LLP, Dallas, TX, for Land–O–Sun Dairies, Inc.

Keith E. Rounsaville, Trenam, Kemker, Scharf, Barkin, Frye, O'Neill & Mullis, P.A., Tampa, FL, Carey P. Deyn, Sutherland, Asbill & Brennan, Atlanta, GA, for Pet Inc.

### ORDER

MERRYDAY, District Judge.

This is an antitrust class action in which the defendants seek summary judgment based on the Clayton Act's four-year statute of limitation. Before the Court are the defendants' joint motion for summary judgment (Doc. 229), Pet, Inc.'s ("Pet") motion for summary judgment (Doc. 227), McArthur Dairy, Inc.'s ("McArthur") motion for summary judgment (Doc. 232), and Southland Corp.'s ("Southland") motion for summary judgment (Doc. 233).[1]

The parties agree on the following facts. The plaintiffs are retailers of fluid milk. The defendants are dairies engaged in the production and sale of fluid milk in Florida and other states. Beginning in the early 1970s, the defendants, Borden, Inc. ("Borden"), Pet, Inc., Flav–O–Rich, Inc. ("Flav–O–Rich"), the Southland Corporation, T.G. Lee Foods, Inc. ("T.G.Lee"), McArthur Dairy, Inc., and Gustafson's Dairy, Inc. ("Gustafson's"), conspired and combined to artificially inflate the price of fluid milk to Florida public school districts. The defendants submitted artificial bids and effectively divided the school milk market among themselves. The public schools paid higher prices for milk as a result.

In mid–1987, the United States and the state of Florida began investigating anti-competitive activities in the dairy industry. During July and August, 1987, Florida's Attorney General subpoenaed documents from and deposed employees of many dairies operating in Florida. On February 16, 1988, the state of Florida filed a civil lawsuit against ten dairies, many individuals, and certain milk distributors. The complaint alleged that Southland, Pet, Borden, McArthur, Flav–O–Rich, and others violated federal antitrust laws. The state of Florida also alleged that the defendants fraudulently concealed their activities by secretly conducting meetings and confining to key individuals information regarding the dairies' efforts to unreasonably restrain trade.

The investigations, criminal charges, and civil action were reported in February, 1988, by every major newspaper in Florida. The newspaper articles discussed the defendants' agreements to fix prices and bids for school

---

1. Also before the Court is the plaintiffs' motion to strike the affidavit of Jay D. Gurmankin (Doc. 245). Mr. Gurmankin's affidavits and his deposition testimony are not so discordant as to warrant striking the affidavit. Additionally, Mr. Gurmankin is an officer of the Court and a neutral observer. Upon consideration, the motion is **DENIED.** The plaintiffs' motion to extend the time to respond to the summary judgment motions (Doc. 238) and motion for leave to file a surreply (Doc. 267) are **GRANTED.** The Clerk is directed to file the plaintiffs' surreply. The plaintiffs' motion to strike the defendants' motions for summary judgment (Doc. 250) is **DENIED.** Defendant, Pet Incorporated's, motion to file supplemental memorandum (Doc. 275) is **GRANTED.**

milk and included stern condemnations of the defendants by Florida's Attorney General. The articles announced that the antitrust investigation was the largest ever initiated against the dairy industry, that it had the potential to grow even larger, and that the federal government was also scrutinizing the industry. Edmund Morton, the president of plaintiff Morton's Market, read at least some of these articles. The principal of plaintiff J & J Produce and Deli heard from her spouse that the state had sued the dairies.

During late 1987 and early 1988, the U.S. Department of Justice charged the defendants and some of their employees with criminal antitrust violations. Flav–O–Rich's division manager pled guilty to conspiring to rig bids for school milk. On March 10, 1989, the general manager of Borden's Tampa plant pled guilty to rigging bids for school milk contracts. In 1990, McArthur Dairy, T.G. Lee, Borden, Southland, and Pet pled guilty to conspiring to rig school milk bids. Flav–O–Rich pled guilty to similar charges in 1991. Gustafson's pled guilty in 1992 to conspiracy to fix the prices of fluid milk in Florida and Georgia between the early 1970's and August, 1988. The government did not charge any of the defendants with antitrust activity occurring after 1988.[2]

The plaintiffs did not investigate the circumstances that resulted in any of the state or federal charges. They contentedly continued to purchase milk from the defendants during the sundry government actions. They did not inquire of the defendants or the defendants' distributors regarding the prices the plaintiffs paid for milk. The plaintiffs conducted no investigation until contacted by one of their attorneys in 1992 or 1993.

Subsequent to the government actions, the plaintiffs filed these consolidated cases. The

plaintiffs allege that, during the same period of time as the bid-rigging and continuing until 1992, the defendants also fixed the milk prices for commercial and wholesale customers. The plaintiffs complain that the defendants' representatives either agreed on the amount and timing of price increases to retailers or agreed to pass certain set portions of fluid milk prices to the plaintiffs.

The defendants argue that the four-year statute of limitation bars the plaintiffs' claims. (The record fails to contain any evidence suggesting that any antitrust violation occurred after July 1, 1989, four years before the plaintiffs' first complaint.[3]) The plaintiffs respond that equitable tolling preserves their otherwise extinguished claims.

Assuming the existence of an unlawful conspiracy to fix prices, the first issue to resolve is the time that the conspiracy terminated. The plaintiffs allege that the price-fixing conspiracy and the acts in furtherance of the conspiracy continued until May 13, 1992. However, the evidence compels the conclusion that the conspiracy ended before 1992.

The state of Florida and the United States began investigating the milk industry five to six years earlier. As early as 1987, knowledge of the state of Florida's investigation of the defendants' bid-rigging was common, at least among industry members. On May 3, 1988, the United States filed the first case resulting from its antitrust investigation.[4] Between May, 1988, and June, 1989 (more than four years before the plaintiffs' lodged their first complaint in this case), the United States filed eight more criminal cases resulting from the defendants' rigging of school milk contract bids.[5] By May 25, 1990, five Borden executives had pled guilty and were sentenced for school milk bid-rigging, an especially galling offense against decent citizenship.[6] As early as December 6, 1990, the

---

**2.** Except Gustafson's, which was charged in May, 1992, with price-fixing.

**3.** Pet and McArthur were not sued in the first complaint.

**4.** *United States v. Sunny Florida Dairy, Inc.,* 88–134–CR–T–10C.

**5.** *United States v. James T. Hall, et al.,* 88–348–CR–T–10C; *United States v. Christopher C. Howard,* 88–363–CR–T–17C; *United States v. Timothy*

*P. Tanna,* 88–203–CR–J–16; *United States v. A. Lamar Garrett,* 88–385–CR–T–13B; *United States v. Jack Parker Tribble Sr.,* 89–21–CR–T–13B; *United States v. Lenard O. Jackson,* 89–72–CR–T–13A; *United States v. Land–O–Sun Dairies, Inc.,* 89–116–CR–T–13A; and *United States v. Lee F. Hallberg,* 89–130–CR–T–13A.

**6.** Edmund Morton testified that he knew two individuals who pled guilty to antitrust charges.

Department of Justice informed United States District Judge William J. Castagna of its continuing investigation of wholesale price-fixing by dairies (in addition to bid-rigging activities).[7] The Department of Justice noted that the dairy cases garnered prominent and widespread notoriety because of the cumulative impact on an industry so intimately associated with the public's well-being.

The criminal informations resulting from the federal investigation charged the defendants and their employees with bid-rigging and conspiring to rig bids from the early 1970s through 1988. The defendants' plea agreements recognized that the defendants ceased their bid-rigging by July, 1988. The record reveals that any price-fixing activity occurred concurrently with the bid-rigging. With the arguable exception of one isolated and ambiguous conversation between Tim Tanna of Flav–O–Rich and Joseph Patton of Gustafson's in 1988,[8] the record lacks any competent evidence that the defendants unlawfully contrived the prices they charged commercial customers after 1987.[9]

█ Section 15b of Title 15, United States Code, which prescribes the limitation on antitrust actions brought by private parties, bars a cause of action pursuant to the antitrust laws unless commenced within four years after the cause of action accrued. Because the defendants demonstrate that the applicable statute of limitation bars the plaintiffs' claim, the plaintiffs must advance an adequate and justified reason that warrants the equitable tolling of the statute. *Prather v. Neva Paperbacks, Inc.*, 446 F.2d 338, 340 (5th Cir.1971). A plaintiff relying on fraudulent concealment to toll a statute of limitation bears the burden of persuasion. *In re Beef Industry Antitrust Litigation*, 600 F.2d 1148, 1171 (5th Cir.1979). To toll the applicable limitation by reason of fraudulent concealment, the plaintiffs must show (1) that the defendants affirmatively concealed facts that are the basis of the plaintiffs' claims,[10] (2) that the plaintiffs failed to discover those facts within the statutory period, and (3) that the plaintiffs exercised due diligence. *Hill v. Texaco, Inc.*, 825 F.2d 333, 335 (11th Cir. 1987); *Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F.2d 211, 218 (4th Cir.1987). To survive the defensive motions, the plaintiffs must establish the existence of a genuine issue of material fact as to each of these elements. *Pinney Dock & Transport Co. v. Penn Cent. Corp.*, 838 F.2d 1445, 1465 (6th Cir.1988). If considered at the outset, the second and third elements of the defense resolve the issue of the defendants' putative concealment without respect to the first element of the defense.

█ For the purpose of this motion, I presume that the plaintiffs were unaware of the defendants price-fixing before 1987.

---

7. December 6, 1990, letter from Department of Justice attorneys John R. Fitzpatrick and Sylvia T. Andrews–McCoy to the Honorable William J. Castagna, United States District Judge, Middle District of Florida.

8. Based on Mr. Tanna's uncontradicted deposition testimony, Mr. Tanna and Mr. Patton apparently discussed the price that a customer paid to a competitor for fluid milk. As a result of this conversation, Flav–O–Rich may have actually lowered its price with respect to that customer. The record fails to contain any evidence tending to show that this exchange, even if improper, caused Flav–O–Rich to raise any prices.

9. The defendants were, by all accounts, circumspect enough to terminate the illegal bid-rigging (and price-fixing) as a result of the state and federal investigations.

10. There are two exceptions to the rule requiring affirmative acts of concealment: 1) if the defendant has a fiduciary responsibility to disclose (not alleged here), and 2) if the wrong is considered "self-concealing". *Hill v. Texaco, Inc.*, 825 F.2d 333, 335 n. 2 (11th Cir.1987).

The plaintiffs argue that the nature of the defendants' actions are "self-concealing". However, concealment is not an attribute that uniformly attends an episode of price-fixing. *Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.*, 71 F.3d 119, 123 (4th Cir.1995); *Texas v. Allan Constr. Co.*, 851 F.2d 1526, 1529 (5th Cir.1988). As with nearly every illegal scheme, antitrust conspirators seek to restrict public knowledge of the unlawful plan. To conspire otherwise is to unaccountably invite incarceration. The concealment to which the applicable limitation defers is not the attempt of the perpetrators to avoid detection but some inherent aspect of the offense that insulates the perpetrator against detection by the hapless victim. The acts of which the plaintiffs complain are therefore not "self-concealing", unlike, for example, corporate espionage or electronic surveillance.

However, by February 13, 1988, the plaintiffs knew or should have known that the state of Florida had filed a lawsuit alleging bid-rigging against members of the dairy industry. The plaintiffs knew or should have known that the state of Florida believed the defendants' antitrust conspiracy to be the largest in the state's history. The accompanying circumstances of this case are easily sufficient to visit on the plaintiffs the legal burden of knowledge that the dairies and their distributors were accused of crimes and were fined or imprisoned accordingly. Although public information may not have alerted the plaintiffs to the specific facts of their particular claims, the readily available and richly publicized information reasonably would arouse in persons of normal apprehension an acute suspicion that they may constitute the object of a criminal enterprise afoot in the pertinent industry.[11]

■ Albertsons supermarket, a grocery chain situated similarly to the plaintiffs, learned of the state of Florida's bid-rigging suit against the defendants. Jay Gurmankin, former "outside counsel" for Albertsons, provided two uncontradicted affidavits indicating that the government investigations and ensuing lawsuit aroused Albertsons's suspicions. Mr. Gurmankin's testimony about the reason the defendants' bid-rigging spawned Albertsons's pursuit of an independent investigation, although no more than a familiar platitude, is succinct and telling: "[W]here there's smoke, there's fire." This is particularly true because the state of Florida alleged in its February, 1988, lawsuit that the defendants had fraudulently concealed their conspiratorial activities. The plaintiffs seek to toll the statute of limitations until the government established a viable cause of action the plaintiffs could adopt. However,

consequent to inquiry notice, the limitations period is not tolled while a plaintiff conducts discovery or some other investigation in an effort to confirm or bolster his suspicions. *Prather*, 446 F.2d at 341.[12]

■ The third element, due diligence, is inextricably linked to the plaintiffs' imputed knowledge. " '[R]easonable diligence' does matter, and a plaintiff who is not reasonably diligent may not assert 'fraudulent concealment'." *Klehr v. A.O. Smith Corp.*, —— U.S. ——, ——, 117 S.Ct. 1984, 1993, 138 L.Ed.2d 373 (1997).[13] The purpose of private antitrust actions is not merely to compensate victims but also to expedite enforcement of the pro-competitive economic policies of the United States by encouraging private litigation by victims who diligently detect, investigate, and economically deter unlawful activity. *Id.*

The plaintiffs' inquiry notice of the pending federal criminal investigations and prosecutions and the state's civil lawsuit should have prompted the plaintiffs to investigate the defendants' conduct with respect to commercial customers. At the least, the state of Florida's accusation that the defendants fraudulently concealed their antitrust related activities should have prompted the inquiry. The plaintiffs learned that the defendants were accused of acting jointly to the detriment of other substantial commercial customers (i.e., Florida's school districts). The knowledge that the dairy industry in general and the defendants in particular engaged in an ongoing antitrust conspiracy of troublesome, if not pervasive, magnitude should have excited suspicion among the plaintiffs as to why the prices for fluid milk were identical among all competitors. Had the plaintiffs exercised

---

**11.** In their papers, counsel for the plaintiffs asserts that the connection between bid-rigging and price-fixing is "manifest".

**12.** "Once the statute of limitations has been tolled, it is not necessary that plaintiff obtain a thorough understanding of all the facts to halt the suspension. Defendant is not required to wait until plaintiff has started substantiating its claims by the discovery of evidence. Once plaintiff is on inquiry that it has a potential claim, the statute can start to run." *Prather*, 446 F.2d at 341.

**13.** Justice Scalia's concurrence, although critical of the majority's "piecemeal" approach to the RICO statute of limitations, further supports my conclusion that the plaintiff must demonstrate that he "neither knew nor, in the exercise of due diligence, could reasonably have known of the offense." *Klehr*, —— U.S. at ——, 117 S.Ct. at 1993, 138 L.Ed.2d 373 (Scalia, J., concurring in part and concurring in judgment).

due diligence during the statutory period, they would have discovered most, if not all, of the facts upon which they now base their claims. "To hold that a tolling or suspension of the limitation of actions must continue unless or until proof positive existed of a wrong (which might never be established in fact) would abort the policy of the law of repose in statutes of limitations of diligence in the equitable principles permitting suspension of them." *Pinney,* 838 F.2d at 1478.

In view of the entire record, I am unable to conclude that the plaintiffs acted diligently. The public records describing the criminal informations and the investigations of both the state and federal governments were readily available to the plaintiffs. *See In re Beef Industry,* 600 F.2d at 1169–70. In 1987, the public knew that the defendants' employees had been subpoenaed and charged with criminal violations. On February 13, 1988, every major newspaper in the state announced the dairy industry's alleged antitrust violations. In the following months, the United States prosecuted the dairies and their employees. One by one, the plaintiffs' acquaintances at the dairies were prosecuted for criminal antitrust activities. Even if they did not know all of the facts supporting their current claims, the plaintiffs should have conducted some investigation, formal or informal, by February, 1988, regarding the existence of *potential* claims against the defendants.[14] Had they filed suit at any time between February, 1988, and February, 1992, the plaintiffs could have issued subpoenas, conducted depositions, and propounded interrogatories, as they did after 1993. The plaintiffs could have then formulated the basis for their current action.[15]

The plaintiffs also argue that adverse effects on the price of milk lasted beyond the last overt act, thereby extending the limitations period. However, absent special circumstances, the statute of limitations runs from the commission of the injurious act rather than from the recognition of the resulting injury. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 338–39, 91 S.Ct. 795, 806, 28 L.Ed.2d 77 (1971). The plaintiffs' claims are devoid of the special circumstances readily apparent in *Zenith Radio.*

Zenith sued Hazeltine for antitrust violations arising from Hazeltine's participation in so-called "patent pools". Many years after Hazeltine's injurious acts, Zenith claimed to suffer continuing damages. Changing market conditions "five to 10 years hence" precluded Zenith's proving damages at the time of those acts, because both the existence and extent of those damages lacked certainty. 401 U.S. at 341–42, 91 S.Ct. at 807–08. Zenith argued that, because the damages (future lost profits) were so speculative, a cause of action could not have accrued at the time of the defendant's acts.

Generally, "each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act." *Zenith Radio,* 401 U.S. at 338, 91 S.Ct. at 806. An exception exists in the special circumstance where the plaintiff demonstrates future damages are so speculative or conjectural as to effectively prohibit calculation of their amount and nature. 401 U.S. at 339, 91 S.Ct. at 806. *Zenith Radio* holds that had the plaintiff, Zenith, tried to recover its future lost profits at the time of the defendant's conspiratorial acts, Zenith's damage claims "would have probably gotten short shrift in the lower courts." 401 U.S. at 341–42, 91 S.Ct. at 807–08.

The exception described in *Zenith Radio* is inapplicable to the claims asserted by the

---

**14.** Because the plaintiffs did not diligently investigate their potential claims at the time they had actual or constructive knowledge of the defendants' antitrust violations, I need not determine the extent of the defendants' concealment.

**15.** I reviewed the conduct of which the plaintiffs complain. I find that some acts occurring before February, 1988, could cause me to conclude that a factual question of actual concealment is present. However, the record is also clear that by early 1988, the great bulk of the evidence upon which the plaintiffs now rely, as well as the state of Florida's allegations of antitrust violations and fraudulent concealment, resided notoriously in the public domain.

plaintiffs in this action, who allege damages (the difference between competitive market price and actual price) readily calculable at the time of the defendants' infractions. Had the plaintiffs sought to recover future lost profits seven years ago, the fact finder at that time could have determined the nature and amount of damages. In fact, the necessary calculation is the lowest and simplest common denominator for a present showing of future damages. No special circumstances, like those in *Zenith Radio,* obscure the plaintiffs' damages or reduce them to the realm of conjecture or speculation. The plaintiffs advance no competent evidence that either the existence of economic loss or the extent of the loss was not fairly calculable and readily identifiable at the time of the defendants' transgressions against the antitrust laws of the United States.[16] The defendant's alleged price-fixing (and bid-rigging) terminated no later than the end of 1987. Consequently, the cause of action accrued and the limitations period commenced before 1989.

Finally, the plaintiffs rely on 15 U.S.C. Section 16(i) to toll the statute of limitations. Section 16(i) suspends the running of the statute of limitations in private antitrust actions during the pendency of any criminal or civil antitrust proceeding brought by the United States and for one year thereafter. 15 U.S.C. § 16(i). The limitations period is suspended only with respect to those private claims based in whole or part on the actions complained of in proceedings by the United States. An action so suspended is forever barred if not brought within four years after the cause of action accrued or within the suspension period. Section 16(i) does not suspend the running of the statute of limitations if the United States initiates its proceedings more than four years after the cause of action accrued.

Section 16(i) provides the plaintiffs no relief. The plaintiffs' action is not based in whole or in part upon the actions complained of in any of the United States' proceedings prior to May, 1992, by which time the statute

of limitations had run. The government investigated and charged the defendants with rigging the bids for school milk contracts. While bid-rigging is a proscribed antitrust activity, and the government's broad investigation should have aroused the plaintiffs' suspicions of potential claims, it is not the same violation as price-fixing. Despite some similarities between the two causes of actions, the plaintiffs did not sue the defendants for the defendants' bid-rigging. Thus, there is no direct correlation between the causes of action such that the United States' criminal prosecutions would suspend the limitations that govern the plaintiffs' claims.

Admittedly, these defendants are egregiously culpable in some respects for their corporate activities. The instincts of the citizenry are justly aroused in hostility against those who would profit, quite literally, by robbing from the mouths of our children. However, two considerations intrude into this collision between the commonwealth and corporate spoliation of the public's trust. First, the government, through the criminal laws, has meted out punishment. Second, the statutes of limitations persist over the years for good and established reasons and should not succumb to sophistry simply to further discipline parties already called to task by the prosecutor. The motions are GRANTED. The Clerk is directed to enter judgment against the plaintiffs and in favor of defendants Borden, Pet, Flav–O–Rich, Southland, T.G. Lee, and McArthur.

---

16. Because they seek to invoke an exception and avoid the limitations bar, the plaintiffs bear the burden of demonstrating that their alleged damages were so speculative as to prevent calculation and recovery. *Kabealo v. Huntington Nat. Bank,* 17 F.3d 822, 827 (6th Cir.1994).