IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
August 7, 2013 Session

**RONALD D. GRAHAM, ET. AL. V. BRADLEY COUNTY, TENNESSEE**

**Appeal from the Circuit Court for Bradley County**
**No. V-09-491     Hon. J. Michael Sharp, Judge**

_____

**No. E2012-02369-COA-R3-CV-FILED-SEPTEMBER 17, 2013**
_____

This is a negligence case in which the Grahams were severely injured when the top portion of a tree collapsed, hitting their car while they were driving in Cleveland, Tennessee. Plaintiffs filed suit against the County, alleging that the County's failure to maintain and inspect its roadways caused the accident. The County alleged that it could not be held liable pursuant to the Tennessee Governmental Tort Liability Act, codified at Tennessee Code Annotated section 29-10-101, et. seq. Following a trial, the trial court dismissed the complaint. The Grahams appeal. We affirm the decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., P.J., and THOMAS R. FRIERSON, II, J. joined.

Michael E. Jenne, Cleveland, Tennessee, for the appellants, Ronald D. Graham and Winifred Marie Graham.

Thomas E. LeQuire, Cleveland, Tennessee, and Courtney E. Smith, Nashville, Tennessee, for the appellee, Bradley County, Tennessee.

**OPINION**

**I. BACKGROUND**

On July 21, 2008, Ronald Graham, M.D. ("Husband") was driving a Volkswagen convertible with his wife, Winifred Marie Graham ("Wife"), in the front passenger seat. As they passed property owned by Henry and Gayle Evans on Tunnel Hill Road, the top portion

of a sugar maple tree ("the Tree") fell onto the vehicle, injuring Husband and Wife (collectively "the Grahams"). Husband's injuries were severe, and Wife's injuries were life-threatening and greatly affected her quality of life following the accident.

It was later learned that approximately 15 years earlier, the Tree had been damaged to such an extent that it had begun the process of decay and had lost approximately 85 percent of its strength. Believing that the tree was defective, unsafe, dangerous, and should have been removed prior to their accident, the Grahams filed suit against the Evanses and Bradley County ("the County"). The County asserted that it was immune from suit pursuant to the Tennessee Governmental Tort Liability Act ("the GTLA"). The Grahams responded that immunity pursuant to the GTLA should be removed because the County had actual or constructive notice of the Tree's condition. The Grahams eventually settled their premises liability claim against the Evanses. Despite vehement objections from the Grahams, the trial court allowed the County to amend its answer to allege the comparative fault of the Evanses. The amendment was allowed after discovery had commenced but before trial.

The case proceeded to trial,[1] where the Grahams testified extensively concerning their injuries as a result of the accident.[2] We, like the trial court, believe that there was no question that the Grahams, specifically Wife, suffered severe, permanent injuries that affected their quality of life. The facts recounted in this opinion will relate to the main issue on appeal, namely whether the County had notice of the Tree's condition.

A number of witnesses testified at trial and a portion of deposition testimony from Thomas Edward Collins was also read into the record. Mr. Collins testified that he was the County's Road Superintendent and that prior to attaining that position, he was employed by the Tennessee Department of Transportation ("TDOT") for approximately 24 years. Throughout the last 12 years of his employment with TDOT, he worked in the maintenance department and was responsible for repairing and maintaining state roads. He was eventually promoted to district superintendent and was responsible for managing employees and the general maintenance of the roads and right-of-ways in several counties. When he became the County's Road Superintendent, he had essentially the same duties he held with TDOT but was focused on county roads instead of state roads.

---

[1] The trial court denied the County's motion for summary judgment, finding that material issues of fact necessitated a trial on the merits.

[2] Lucy Moore, Stephanie McWhorter, and Tracy Eiberger also testified concerning Wife's injuries and her inability to lead the life she had once led before the accident.

Mr. Collins admitted that the County was specifically responsible for maintaining Tunnel Hill Road and was required to "inspect" and "repair any unsafe conditions." He agreed that the County had taken action to remove hazards that were above the roads. He stated that when conditions on private property affected the roads, he either asked the property owner to remedy the condition or obtained an entrance permit to enter the property and remedy the condition. He claimed that if the condition presented an emergency situation, the County did not wait for permission. He could not recall an instance in which the county hired a professional to ascertain whether trees posed an emergent situation but conceded that employees notified him of conditions that could cause danger to users of the roadway. He asserted that the County paved the road, patched potholes, mowed county property near the road, removed litter, and trimmed trees, brush, and bushes near the road.

Mr. Collins also offered live testimony at trial. He acknowledged that the Tree was visible from the road and that county workers had likely passed by the Tree as they responded to complaints and performed general maintenance nearby. He admitted that the Tree had been trimmed in 2006 but did not have any record of whether the County trimmed the Tree even though the County was trimming trees in that area during that time. He suggested that the Tree could have been trimmed by the Tennessee Valley Authority.

Mr. Collins testified that he was responsible for maintaining approximately 750 miles of county roads and asserted that there were countless trees alongside the roadways. He asserted that the County did not have the budget or the manpower to inspect each tree and ascertain whether that tree was in a weakened condition. He stated that Tunnel Hill Road was approximately 7.4 miles long and was positioned alongside pastures and wooded areas. He provided that the County did not touch the trees unless a specific tree posed a hazard. He claimed that he never received a specific complaint about the Tree, that he never noticed the Tree as he drove through the County, and that there were no other accidents or injuries as a result of falling trees on Tunnel Hill Road. He stated that there was a "severe storm" on the day of the accident and that he received approximately ten reports concerning trees or tree limbs that had fallen onto the county roads because of the storm.

Wife, who was 64 years old at time of trial, could not remember the accident. She said that prior to the accident, she and Husband passed the Tree several times a month while traveling on Tunnel Hill Road. She claimed that during one of their prior trips, she noticed that an oak tree was leaning on the Tree. She also noticed that one of the Tree's limbs was extended over the roadway. While she was curious about the Tree, she never called the County to file a report or mentioned the Tree to anyone, including Husband.

Husband, who was 64 years old at the time of trial, confirmed that he and Wife traveled on Tunnel Hill Road several times a month. He recalled that it was not raining or

windy when they left the house on the day of the accident. He could not remember the accident but recalled waking in the car to rain and the sound of "chain saws buzzing." He never noticed the Tree before the accident, but he and Wife inspected the Tree after the accident. In walking the area, he found a spring that traveled near the roadway and a tile or drain situated in front of the spring that diverted water underneath the roadway. He stated that the distance between the trunk of the Tree and the roadway was approximately 15 feet and that the spring was approximately 21 feet from the base of the Tree. He related that when he stood at the spring or the drain by the roadway, he could easily view the Tree.

Mr. Evans testified that he owned the property where the Tree was situated. He acknowledged that the Tree was behind his fence line and that an oak tree had fallen onto the Tree. He recalled that in 2000 or 2001, he and his son attempted to remove the oak tree but were unsuccessful in their attempt. He said that anyone walking on the roadway would have noticed the Tree's limb that extended over the roadway, that the Tree and its limbs appeared to be alive, and that the Tree was as "green as every other tree down there." He did not notice that the Tree had decayed and did not believe that the Tree posed a danger.

Relative to the accident, Mr. Evans testified that he noticed the accident as he was driving home from dinner. After he parked his car, he walked down to the scene, where he saw emergency workers attempting to free the Grahams from the car. He claimed that there had been a severe thunderstorm that night with thunder, lightening, and strong winds.

Mr. Evans testified that another tree located on his property fell onto the roadway approximately one year before the accident. He claimed that the County removed the tree, which was approximately 600 feet from the accident site. He had also previously complained about the drain that diverted water from the spring. He said that per his request, the County cleared the drain of debris. He acknowledged that the Tree appeared to have been trimmed at some point but asserted that he had never trimmed the Tree.

Carl Absher, a board certified master arborist, testified that he was also a certified utility specialist and had worked with the Electric Power Board of Chattanooga. He claimed that he had extensive experience in assessing the condition of trees and determining whether a tree needed to be trimmed. Relative to this case, he assessed the Tree and found that an older oak tree had fallen onto the Tree and split the Tree, causing one portion to lean over the road. He explained that a casual observer might think that two trees were simply growing side by side. He stated that in reality, the Tree had lost approximately 85 percent of its strength and had suffered extensive decay. He said that the portion of the Tree that was "leaning over the road was damaged" and "badly decayed." He believed that the Tree's defects were visible from the road. He said that the top of the Tree was "too heavy" for the "decayed trunk to support" and that it fell onto the car from a height of approximately 25

-4-

feet. He believed that the wind from the thunderstorm was the "final straw" that caused the Tree to fall but asserted that a healthy tree would not have been affected by the storm.

Mr. Absher conceded that despite the Tree's defective state, the Tree yielded green foliage and was positioned amongst other trees and foliage. He asserted that the Tree was the largest tree in the row and was noticeable because of its size and because of the position of the oak tree. He admitted that one would have to be "looking up in the trees" to see the scar caused by the oak tree. He acknowledged that someone simply walking alongside the road would not notice the Tree's defects and that even if an untrained observer noticed the defects, he or she would probably not realize that the Tree needed to be removed.

Mr. Absher testified that another decayed limb from the Tree had been trimmed in Summer 2006. He related that the limb was at a height of 20 to 25 feet and that he had to use a lift to inspect the limb. He claimed that he observed no reason for any entity other than the County to have trimmed the Tree and that the person who cut the limb would have seen the defects in the Tree. He believed that county workers performing maintenance on the road would have viewed the condition of the Tree and would have been prompted to investigate the condition of the Tree if they had been exercising reasonable diligence. If he had been asked to assess the Tree, he would have recommended that it "either be pruned or removed."

Doris Price testified that just before the accident, she was driving on Tunnel Hill Road. She claimed that the wind was "really, really violent" and that the "trees were swirling on the sides of the road." She claimed that she saw the Tree bounce on the Grahams' car as she was approaching the site of the accident. Troy Spence, the director of Emergency Management for the County, confirmed that the thunderstorm was "pretty severe" and caused "[v]ery high winds" on the night of the accident. He said that as he was traveling toward the accident, he noticed leaves and tree limbs on the road.

Following the presentation of the above evidence, the trial court dismissed the complaint, finding that the County was immune from liability. The court held that there was no proof that the roadway was unsafe as a result of the presence of the Tree or that the County had constructive or actual notice concerning the condition of the Tree. The court stated, in pertinent part,

> The court finds that [the County] did not have any knowledge of facts or circumstances sufficiently pertinent in character to enable [the County] or [its] officials to investigate and to ascertain any further or other information pertaining to [the Tree].

This timely appeal followed.

## II.  ISSUES

We consolidate and restate the issues raised on appeal as follows:

A.  Whether the trial court erred in allowing the County to amend its answer to the complaint.

B.  Whether the trial court erred in finding the County immune from liability.

## III.  STANDARD OF REVIEW

On appeal, the factual findings of the trial court are accorded a presumption of correctness and will not be overturned unless the evidence preponderates against them.  *See* Tenn. R. App. P. 13(d).  The trial court's conclusions of law are subject to a de novo review with no presumption of correctness.  *Blackburn v. Blackburn*, 270 S.W.3d 42, 47 (Tenn. 2008); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993).  Mixed questions of law and fact are reviewed de novo with no presumption of correctness; however, appellate courts have "great latitude to determine whether findings as to mixed questions of fact and law made by the trial court are sustained by probative evidence on appeal." *Aaron v. Aaron*, 909 S.W.2d 408, 410 (Tenn. 1995).

## IV.  DISCUSSION

### A.

The Grahams assert that the County's untimely amendment of its answer unduly prejudiced them.  They claim that their decision to settle with the Evanses was dependent upon the fact that the County had not alleged comparative fault in its initial answer or throughout the two years of discovery following the filing of the complaint.  The County responds that the Grahams were not unduly prejudiced by the amendment when they initially filed suit against the Evanses.

"[A] party may amend [its] pleadings . . . by leave of court; and leave shall be freely given when justice so requires."  Tenn. R. Civ. P. 15.01.  While requiring leave to be freely given lessens the discretion of the trial court in granting or denying such motions, the court's grant or denial of a motion to amend the pleadings is still generally subject to an abuse of discretion standard.  *Merriman v. Cont'l Bankers Life Ins. Co.*, 599 S.W.2d 548, 559 (Tenn. Ct. App. 1979); *see also Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 330 (1971). In determining whether to grant such a motion, the court must consider the following factors: "[u]ndue delay in filing; lack of notice to the opposing party; bad faith by the moving

party; repeated failure to cure deficiencies by previous amendments[;] undue prejudice to the opposing party[;] and futility of amendment." *Merriman*, 599 S.W.2d at 559 (citing *Hageman v. Signal L.P. Gas, Inc.*, 486 F.2d 479 (6th Cir. 1973)).

The County's delay in requesting leave to file the amended complaint was lengthy. Despite the delay, the Grahams cannot claim a lack of notice when they filed suit against the County *and* the Evanses in their initial complaint. The record reflects no evidence of bad faith or a repeated failure to cure deficiencies. The amendment would certainly not be futile when the Tree that caused the injuries at issue in this case was located on property belonging to the Evanses. Lastly, we refuse to find undue prejudice based upon the Grahams' subjective beliefs throughout their settlement negotiations with the Evanses. Accordingly, we affirm the trial court's decision to grant the County leave to file an amended answer, thereby allowing the County to raise the issue of comparative fault.

B.

"In 1973, the General Assembly enacted [the GTLA] to codify the general common law rule that 'all governmental entities shall be immune from suit for any injury which may result from the activities of such governmental entities.'" *Limbaugh v. Coffee Med. Ctr.*, 59 S.W.3d 73, 79 (Tenn. 2001) (quoting Tenn. Code Ann. § 29-20-201(a)). Passage of the GTLA constituted "an act of grace through which the legislature provided general immunity to governmental entities from tort liability but removed it in certain limited and specified instances." *Kirby v. Macon Cnty.*, 892 S.W.2d 403, 406 (Tenn. 1994). The Grahams based their claim for relief against the County on two theories. The first theory relied on a simple negligence claim for failure to maintain the county roadways, while the second theory depended upon Tennessee Code Annotated section 29-20-203. We shall discuss each theory in turn.

1.

It is well settled in Tennessee that the elements of a negligence claim include:

(1) a duty of care owed by the defendant to plaintiff; (2) conduct by the defendant falling below the standard of care amounting to a breach of that duty; (3) an injury or loss; (4) causation in fact; and (5) proximate or legal cause.

*Satterfield v. Breeding Insulation Co.*, 266 S.W.3d 347, 355 (Tenn. 2008). Tennessee Code Annotated section 29-20-205 removes governmental immunity for injuries caused by negligent acts or omissions of county employees. The legislature provided in section 29-20-

205(4) that governmental immunity shall not be removed for failure to inspect property not owned by the County. However, it is admitted by all parties that immunity may be removed for the negligent failure to maintain county roadways. Citing *McHarge v. M.M. Newcomer & Co.*, 100 S.W. 700 (Tenn. 1907), the Grahams assert that the County's duty to maintain its roadways included a "duty to inspect for unsafe conditions that may exist along the roadway and that extend over and above the roadway." The County responds that it "had no duty to inspect the roadway for the potential hazards posed by an adjacent tree" on private property.

In *McHarge*, the defendant hired an independent contractor to repair an awning that hung over Gay Street in Knoxville. 100 S.W. at 701. As the awning was being repaired, an "awning roller" fell from the building and struck a pedestrian, injuring her. *Id.* at 700. The Court held that the defendant, who was the employer of the independent contractor, may be held liable for the contractor's negligence when the "work contracted" for was "intrinsically dangerous." *Id.* at 704. Before reaching its ultimate holding, the Court presented a lengthy discussion on "the rights of the public in the streets of municipalities." *Id.* at 702. While the City of Knoxville was not a party in the case, the Court stated,

> [W]e are of the opinion that it was the duty of the city to see that the awning was properly and safely constructed, and kept in good repair, and that it would be liable for a failure to discharge this duty to an injured party.

*Id.* at 703. The Court extended that reasoning to hold that

> the defendants, when they erected the awning, assumed all the obligations of the city to the public, and something more. It was their duty to exercise a high degree of care and diligence in the construction, maintenance, inspection, and repair of the awning, so as to prevent it from obstructing the street, or endangering those using it; and their failure to do so, or to take proper precautions to protect the public at all times from injury in any way growing out of its maintenance or repair, renders them liable for the damages suffered.

*Id.* The facts presented in *McHarge* are simply inapposite to the facts of this case. The County did not plant the Tree and was not engaged in the process of repairing or trimming the Tree when the accident occurred.

We agree that the County had a duty to maintain its roadways and that the duty likely extended to maintaining obstructions located above the roadway. The analysis of duty is specific to the particular plaintiff and defendant involved. *Nichols v. Atnip*, 844 S.W.2d 655, 662 (Tenn. Ct. App. 1992). Duty is defined as "the legal obligation owed by defendant to plaintiff to conform to a reasonable person standard of care for the protection against

unreasonable risks of harm," and a duty exists "if defendant's conduct poses an unreasonable and foreseeable risk of harm." *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995). A risk is unreasonable where "the foreseeable probability and gravity of harm posed by defendant's conduct outweigh the burden upon defendant to engage in alternative conduct that would have prevented the harm." *Id.* The question of whether a duty exists "requires consideration of whether 'such a relation exists between the parties that the community will impose a legal obligation upon one for the benefit of others – or, more simply, whether the interest of the plaintiff which has suffered invasion was entitled to legal protection at the hands of the defendant.'" *Coln v. City of Savannah*, 966 S.W.2d 34, 39 (Tenn. 1998) (quoting *Prosser & Keaton on Torts* § 37 at 236 (5th ed. 1984)), *overruled on other grounds by Cross v. City of Memphis*, 20 S.W.3d 642, 645 (Tenn. 2000).

In the case at bar, we decline to impose upon the County a duty to inspect every tree that "leaned" over the roadway. Imposing such a duty would place an insurmountable burden upon the County and detract from its ability to maintain the roadways. The County maintained its roadways as relevant to this case by trimming trees that posed obvious issues and by responding to complaints concerning specific trees, brush, and bushes. The evidence reflects that the Tree continued to sprout green leaves, was located amongst other healthy trees, and did not appear to be decayed or damaged to the extent that was discovered after the accident. The County had never received a specific complaint about the Tree, and the only evidence offered concerning the County's interaction with the Tree was pure conjecture, at best. Wife even admitted that she was not concerned for her safety while traveling on the roadway even though she was curious about the Tree and the placement of the oak tree. With these considerations in mind, we conclude that the evidence does not preponderate against the trial court's conclusion that the County had not failed to maintain its roadways.

2.

Plaintiffs also based their claim on the following statute:

(a) Immunity from suit of a governmental entity is removed for any injury caused by a defective, unsafe, or dangerous condition of any street, alley, sidewalk or highway, owned and controlled by such governmental entity. "Street" or "highway" includes traffic control devices thereon.

Tenn. Code Ann. § 29-20-203(a). Unlike a negligence claim, suits brought pursuant to section 29-20-203 have "three essential ingredients." *Burgess v. Harley*, 934 S.W.2d 58, 63 (Tenn. Ct. App. 1996). First, "the local government must own and control the location or instrumentality alleged to have caused the injury." *Id.* Second, the location or

instrumentality must be "defective, unsafe, or dangerous." *Id.* Third, the local government entity must have "constructive and/or actual notice" of the condition. *Id.*

While there were significant issues with the other two ingredients, the third ingredient, notice, was the most hotly contested issue at trial and the determining factor in the court's decision to dismiss the complaint. The Tennessee Supreme Court has defined actual notice as "knowledge of facts and circumstances sufficiently pertinent in character to enable reasonably cautious and prudent persons to investigate and ascertain as to the ultimate facts." *Kirby*, 892 S.W.2d at 409 (quoting *Texas Co. v. Aycock*, 227 S.W.2d 41, 46 (Tenn. 1950)). "Constructive notice" is defined as "'information or knowledge of a fact imputed by law to a person (although he may not actually have it) because he could have discovered the fact by proper diligence, and his situation was such as to cause upon him the duty of inquiring into it.'" *Hawks v. City of Westmoreland*, 960 S.W.2d 10, 15 (Tenn. 1997) (quoting *Kirby*, 892 S.W.2d at 409).

As previously mentioned, the County never received a specific complaint about the Tree. The Grahams presented evidence that the Tree had been trimmed in 2006 and suggested that the County was the only entity that would have had reason to trim the Tree. However, they stopped short of presenting any actual evidence that the County trimmed the Tree. Several witnesses testified that other than the scar caused by the oak tree, the Tree did not appear to be damaged or decayed. Indeed, the Tree continued to sprout green leaves and was positioned amongst healthy trees. Mr. Absher even recognized that one would have to look up into the trees to see the damage caused by the oak tree and that an untrained observer probably would not have understood the significance of the damage. Wife even admitted that she was not prompted to inquire further about the Tree's condition even though she was curious about the Tree. With these considerations in mind, we conclude that the County did not have sufficient knowledge of facts that would have required it to investigate the Tree's condition and that the Tree's condition was not something that could have been discovered without extensive investigation. We affirm the trial court's dismissal of the complaint because the County did not have actual or constructive notice of the Tree's condition.

## V. CONCLUSION

The judgment of the trial court is affirmed, and the case is remanded for such further proceedings as may be necessary. Costs of the appeal are taxed equally to the appellants, Ronald D. Graham and Winifred Marie Graham.

_____
JOHN W. McCLARTY, JUDGE